# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **ROBERT WILSON,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 07 C 3994 |
| | ) | |
| v. | ) | Judge Charles P. Kocoras |
| | ) | |
| **JAMES O'BRIEN, et al.,** | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Robert Wilson ("Plaintiff"), has sued James O'Brien, other officers of Chicago

Police Department ("CPD"), Assistant State's Attorney William Healy, the City of Chicago, and

the County of Cook ("Defendants"). Before this Court is non-party Maurice Possley's ("Possley")

Motion to Quash Subpoena to Non-Party Journalist or, in the Alternative, For Entry Of A

Protective Order Limiting Subpoena ("Possley's Motion" or "Motion"). This Court rules on this

Motion under Judge Charles P. Kocoras' referral of this case for discovery supervision pursuant

to Local Rule 72.1. For the reasons set forth below, this Court denies Possley's Motion in its

entirety.

## I. Background

The underlying facts of this case are gruesome. The macabre tale begins on February 28,

1997, at a bus stop at 2851 South King Drive, Chicago, Illinois. (Am. Compl. ¶ 13; Defs.'

Answer ¶ 13.) While June Siler ("Siler") waited for a bus, a man attacked her with a box cutter.

(*Id.*) One day after the incident, CPD police officers arrested Plaintiff, a black man, at the same

bus stop at which Siler had been attacked. (Am. Compl. ¶ 14; Defs.' Answer ¶ 14.)

Plaintiff alleged, in his complaint, that the CPD coerced him to confess to attacking Siler by interrogating him for 30 hours. (Am. Compl. ¶¶ 15-16.) Subsequently, Siler identified Plaintiff as the perpetrator of the crime against her. (*Id.* at ¶¶ 19-20; Defs.' Answer ¶ 20.) Plaintiff alleged that CPD police officers conspired to manipulate Siler into identifying Plaintiff as the man who attacked her. (Am. Compl. ¶ 19-20.) Plaintiff further alleged that this concocted confession conflicted with Siler's testimony recounting the attack. (Am. Compl. ¶ 17.)

In the two weeks following the attack on Siler, an individual named Jerryco Wagner ("Wagner") used an icepick or knife to stab five male and female victims (most of whom were white and one who was Hispanic). (*Id.* at ¶ 21; Defs.' Answer ¶ 21.) Plaintiff alleged that Wagner's "modus operandi" in each stabbing was "highly similar" to the attack on Siler. (Am. Compl. ¶ 21.)

The CPD investigated the attacks perpetrated by Wagner, arrested him on March 15, 1997, and eventually charged him with crimes for each of the five incidents. (Am. Compl. ¶ 21; Defs.' Answer ¶¶ 21, 23.) Two years later, in November 1999, Plaintiff was tried for the attempted murder of Siler in the Circuit Court of Cook County, convicted, and sentenced to thirty years' imprisonment. (Am. Compl. ¶ 24; Defs.' Answer ¶ 24.) Plaintiffs alleged that "[d]uring the criminal proceedings, [the trial judge barred] Plaintiff's trial counsel . . . [from] introduc[ing] evidence regarding Wagner's other five attacks . . . to establish that Wagner . . . attacked Siler . . . ." (Am. Compl. ¶ 26.)

Plaintiff unsuccessfully appealed his conviction to the Illinois Appellate Court. (Am. Compl. ¶ 28; Defs.' Answer ¶ 28.) Plaintiff then filed a petition for leave to appeal to the Illinois Supreme Court, which the Illinois Supreme Court summarily denied. (*Id.*) After the trial court

denied Plaintiff's timely Petition for Post-Conviction Relief, Plaintiff appealed to the Illinois

Appellate Court. (*Id.*) Once the Appellate Court denied his petition, Plaintiff filed a petition for

leave to appeal to the Illinois Supreme Court, which the Illinois Supreme Court denied. (*Id.*)

Thereafter, on January 13, 2006, Plaintiff filed a petition for a writ of habeas corpus.

(Am. Compl. ¶ 29; Defs.' Answer ¶ 29.) Over nine months later, on October 20, 2006, Judge

Ruben Castillo exonerated Plaintiff by granting his petition, finding that the state court violated

"Plaintiff's 'Sixth Amendment right to present a complete defense' . . . refus[ing] to admit

evidence at trial pertaining to . . . Wagner." (Am. Compl. ¶ 30 (quoting *Wilson v. Firkus*, 457 F.

Supp. 2d 865, 889-90 (N.D. Ill. 2006)); Defs.' Answer ¶ 30.)

The facts concerning this motion relate to what happened after Judge Castillo's decision

exonerating Plaintiff. On or around October 20, 2006, Possley, a journalist for the CHICAGO

TRIBUNE who specializes in the criminal justice system, began investigating Plaintiff's case.[1]

(Possley's Mem. in Supp. of Mot. 2, Ex. A at ¶¶ 2, 4-5.) Prior to October 20, 2006, Possley "had

not investigated or reported on [Plaintiff's] criminal trial." (*Id.* at ¶ 4.)

While investigating Plaintiff's case, Possley wrote three articles, interviewed Siler, and

covered Judge Castillo's decision. (*Id.* at ¶¶ 3, 5.) His first article, "published in the CHICAGO

TRIBUNE on October 26, 2006[,] . . . covered Judge Castillo's October 20, 2006[,] decision." (*Id.*

at ¶ 3.) After publishing that article, Possley called Siler to "interview her and get her reaction to

the court's order granting [Plaintiff] a new trial." (*Id.* at ¶ 5.) During the interview, Possley

informed Siler of Judge Castillo's decision exonerating Plaintiff. (*Id.*) This was the first time

---

[1] Possley also has taught investigative journalism at two universities, including
Northwestern University's Medill School of Journalism. (Possley's Mem. in Supp. of Mot. 2, Ex.
A ¶ 2.)

Siler heard of Judge Castillo's decision, and, in response, Siler apparently recanted her identification testimony. (*Id.*) Indeed, Siler testified that she had second thoughts about her original identification of Plaintiff as the individual who attacked her. (Defs.' Am. Resp. to Possley's Mem. in Supp. of Mot. 2, Ex. A at 44-45.) Siler also testified that Possley informed her of various facts about the case, including facts about the attacks committed by Wagner. (*Id.* at 42-45.)

Possley published the second article describing this interview and Siler's recanting, which appeared in the CHICAGO TRIBUNE on November 15, 2006. (Possley's Mem. in Supp. of Mot. 2, Ex. A ¶ 5.) Possley's third and final article appeared in the February 18, 2007, edition of the CHICAGO TRIBUNE. (*Id.* at ¶ 6.) This article reported "that [Plaintiff] had been released from prison." (*Id.*) It also reported on "[Possley's] observations of [Plaintiff] and Siler at a forum at Northwestern University Law School where [Plaintiff and Siler] jointly spoke about Siler's attack, [Plaintiff's] arrest[,] and the underlying criminal trial." (*Id.*) Possley claims that he does not "have any notes regarding the articles about [Plaintiff]." (*Id.* at ¶ 7.) He further claims that he has no audiotapes, videotapes, or other sound recordings regarding his interview with Siler or his articles about Plaintiff. (*Id.*) Possley's conversations with Siler are not subject to any confidentiality agreement, and, obviously, she is not a confidential source.

On December 4, 2007, Plaintiff sued Defendants in the United States District Court for the Northern District of Illinois, alleging the following bases for liability under 42 U.S.C. § 1983 (2006): violation of Due Process, conspiracy, and failure to intervene. (Am. Compl. ¶¶ 44-63.) Plaintiff also alleged the following state law claims: malicious prosecution, civil conspiracy, and intentional infliction of emotional distress, as well as recovery based on theories of respondeat

superior and indemnification. (*Id.* at ¶¶ 64-86.) The District Court had jurisdiction under 28

U.S.C. §§ 1331, 1367 (2006). (Am. Compl. ¶ 6; Defs.' Answer ¶ 6.)

Discovery ensued, and Defendants subpoenaed Possley for a deposition on January 8,

2009 (the "Subpoena"). (Possley's Mem. in Supp. of Mot. 2, Ex. C.) Possley opposed the

Subpoena, filing the Motion currently before this Court. In this Motion, Possley argues this

Court should quash, or narrow the scope of, the Subpoena for several reasons. First, Possley

contends that federal and state common law reporter's privileges prevent Defendants from

deposing Possley pursuant to the Subpoena, or at least require limitations on the deposition. (*Id.*

at 11-15.) Second, even if neither privilege applies, Possley argues that the Subpoena violates

Federal Rule of Civil Procedure 45(c) ("Rule 45(c)"). (*Id.* at 6-11.) This Court addresses each of

Possley's arguments in the following sections.

## II. Discussion

### A. Federal and State Reporter's Privileges

Possley argues that either or both the federal or state reporter's privileges require this

Court to quash, or narrow the scope of, the Subpoena.

#### 1. Federal Reporter's Privilege

First, Possley contends this Court should quash or modify the Subpoena because the

federal common law reporter's privilege protects him. (Possley's Mem. in Supp. of Mot. 11-15.)

Basically, Possley argues that the Seventh Circuit's decision in *McKevitt v. Pallasch*, 339 F.3d

530, 532 (7th Cir. 2003), "left open the possibility of a federal reporter's privilege rooted in

federal common law" (Possley's Mem. in Supp. of Mot. 12) because "'the constitution is not the

only source of evidentiary privileges.'" (*Id.* (quoting *McKevitt*, 339 F.3d at 532).)

Since we are bound by the Seventh Circuit's decisions, Possley is certainly correct to cite

*McKevitt,* which addressed the existence of federal reporter's privilege. In *McKevitt,* the Irish

government prosecuted the defendant for illegal organizational affiliations and terrorist activities.

339 F.3d at 531. The defendant requested from the district court an order requiring a group of

journalists--who had a contract to write a witness' biography and who had interviewed the witness

in the course of their research--"to produce tape recordings [the defendant] [thought] [would] be

useful to him in the cross-examination of [the witness]." *Id.* The district court granted the order,

which did not force the journalists to reveal any confidential sources. *Id.* at 531-32. On appeal,

the Seventh Circuit refused to stay the district court's order but did not issue an opinion. *Id.* at

535. In *McKevitt,* the Seventh Circuit explained its original decision denying the stay and

examined whether a federal reporter's privilege existed. *Id.* at 531-33.

The *McKevitt* court started its analysis by examining *Branzburg v. Hayes,* 408 U.S. 665

(1972), a case in which the United States Supreme Court ruled on the existence of a federal

reporter's privilege rooted in the First Amendment. *McKevitt,* 339 F.3d at 531. The Seventh

Circuit noted that some confusion had arisen among the Circuits because Justice Powell issued a

concurring opinion in a 5-4 decision where the majority opinion rejected a federal reporter's

privilege based on the First Amendment. *Id.* at 531-32. In his concurrence, Justice Powell stated

that the reporter's privilege "should be decided on a case-by-case basis" using a balancing test.

*Id.* at 531. *McKevitt* noted that, because Justice Powell "purported to join Justice White's

'majority' opinion," courts have treated the *Branzburg* decision differently. *Id.* at 531-32. In

particular, the Seventh Circuit observed that "[a] large number of cases conclude, rather

surprisingly in light of *Branzburg*, that there is a reporter's privilege, though they do not agree on its scope." *Id.* at 532.

In spite of other courts' treatment of this issue, the Seventh Circuit displayed little reservation in holding that the federal reporter's privilege did not apply in *McKevitt*.[2] *Id.* at 535 (stating that "in this case [the First Amendment] provides no support for the reporters' claim"). In so doing, the court noted that other Circuits extended the reporter's privilege to non-confidential sources because of concerns of harassment, burden, and use of the press as an investigative arm of the government. *Id.* at 533. But the court concluded that, "[s]ince these considerations were rejected by *Branzburg* even in the context of a confidential source, these courts may be skating on thin ice." *Id.*

In addition to expressing serious misgivings about the federal reporter's privilege generally, the Seventh Circuit noted that a case for the privilege was even flimsier when applied to non-confidential sources. *Id.* at 532-33. The court struggled to understand how the First Amendment could bear on the issue of compelled disclosure "[w]hen the information in the reporter's possession does not come from a confidential source." *Id.* at 533. The court aptly noted that the freedom of the press "seeks to encourage publication rather than secrecy." *Id.* (citing *Florida Star v. B.J.F.*, 491 U.S. 524, 533-34 (1989)). As a result, the *McKevitt* court rejected a special subpoena-standard for journalists, refusing to require the subpoenaing party to satisfy "special criteria" merely "because the possessor of the documents or other evidence

---

[2] Since *McKevitt*, the Seventh Circuit has stated in dicta that "[t]here isn't even a reporter's privilege in federal cases." *United States Dept. of Edu. v. Nat'l Collegiate Athletic Ass'n*, 481 F.3d 936, 938 (7th Cir. 2007) (citing *Branzburg*, 408 U.S. 665 *and McKevitt*, 339 F.3d 530).

sought is a journalist." *Id.* at 533. "[R]ather than speaking of privilege, courts should simply

make sure that a subpoena duces tecum directed to the media, like any other subpoena duces

tecum, *is reasonable in the circumstances* . . . ." *Id.* (emphasis added).

Reading the Seventh Circuit's decision, it is difficult to imagine how this Court could

embrace the federal reporter's privilege, especially because there is no confidentiality concern in

this case. Contrary to Possley's assertion that *McKevitt* "involved unique circumstances . . . [that]

are [not] present here" (Possley's Mem. in Supp. of Mot. 12), the primary concern in *McKevitt*

was the confidentiality of the reporters' source.[3] That concern pervades this Court's analysis as

well.

This fact notwithstanding, the Court, after sifting through the jurisprudential remains of

*Branzburg* and its progeny, cannot locate any legal artifacts indicating the existence of the federal

reporter's privilege independent of the First Amendment. It is true, as Possley points out, that

"the Constitution is not the only source of evidentiary privileges.'" (Possley's Mem. in Supp. of

Mot. 11 (quoting *McKevitt*, 339 F.3d at 532 (citing *Branzburg*, 408 U.S. at 689, 706)).) But, like

most of the courts in the cases *McKevitt* mentions, Possley "do[es] not cite other possible sources

of the privilege besides the First Amendment." *McKevitt*, 339 F.3d at 532. Since "[t]here is no

federal general common law," *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), Possley must

---

[3] The court in *Patterson v. Burge*, 2005 WL 43240, at *4 (N.D. Ill. Jan. 6, 2005), notes
that the *McKevitt* court "cited the important public obligation to assist in criminal proceedings
and the federal interest in cooperating in the criminal proceedings of friendly foreign nations as
factors favoring disclosure." *Patterson* did not hold, however, that those factors were *dispositive*
in *McKevitt*, and nor does this Court. *Id.* This Court acknowledges *McKevitt* mentioned those
concerns, but finds, after analyzing the opinion, that its chief focus was confidentiality.
*McKevitt*, 339 F.3d 532-34 (discussing confidentiality at length while only mentioning the two
aforementioned concerns). For that reason, confidentiality remains this Court's primary concern.

do better than claim the existence of a federal common law privilege without articulating its origins. Possley further perplexes this Court by citing for support cases that *McKevitt* discussed but did not endorse. (Possley's Mem. in Supp. of Mot. 12 n.3 (citing *McKevitt*, 339 F.3d at 532 (citing cases).) The cases cited in *McKevitt* uphold a reporter's privilege based on the First Amendment, which the Seventh Circuit chose not to embrace. *McKevitt*, 339 F.3d at 532 (discussing cases and stating that the cases do not cite other possible sources of the privilege).

Further, *McKevitt* stated that, while none of the cases it cited identified other Constitutional sources of the privilege, "other cases do cut the reporter's privilege free from the First Amendment." *Id.* at 532 (citing *United States v. Cuthbertson*, 630 F.2d 139, 146 n.1 (3d Cir. 1980); *In re Grand Jury Proceedings*, 810 F.2d 580, 586-88 (6th Cir. 1987); *Gonzales v. Nat'l Broad. Co.*, 194 F.3d 29, 36 n.2 (2d Cir. 1999)). This Court's review of these cases, however, shows that they all ground their privilege, at least to some degree, in the First Amendment.

In *Cuthbertson*, the Third Circuit recognized "that journalists have a federal common-law qualified privilege arising under FED. R. EVID. 501 to refuse to divulge their confidential sources," which was based, at least in part, on "a policy [the court] found to be grounded in the [F]irst [A]mendment." 630 F.2d at 146 (also citing *Branzburg* to support the proposition that the First Amendment provides a reporter's privilege). Based on these principles, the *Cuthbertson* court extended the federal reporter's privilege to non-confidential, unpublished material held by the press in criminal cases. *Id.* at 147.[4]

---

[4] The court's statement that it "found an independent and congruent basis of authority for the privilege in the Pennsylvania shield law," *id.* at 146 n.1, is irrelevant here, where no
(continued...)

In *In re Grand Jury Proceedings*, the Sixth Circuit adopted, at least as to confidential

sources, a First-Amendment-based balancing test, which it gleaned from *Branzburg*. 810 F.2d at

584-86 (adopting this test and rejecting an explicit First Amendment privilege "[b]ecause . . .

acceptance of the [federal reporter's privilege] . . . would be tantamount to our substituting, as the

holding of *Branzburg*, the dissent written by Justice Stewart (joined by Justices Brennan and

Marshall) for the majority opinion"). In *Gonzales*, the court held that the qualified reporter's

privilege as to non-confidential information was grounded "in a broader concern for the potential

harm to the 'paramount public interest in the maintenance of a vigorous, aggressive[,] and

independent press capable of participating in a robust, unfettered debate over controversial

matters.'" 194 F.3d at 33 (quoting *Baker v. F & F Inv.*, 470 F.2d 778, 782 (2d Cir. 1972)); *id.* at

35, 36 n.6. Those "concerns" smack of the First Amendment. And a reading of *Baker* confirms

that the First Amendment is exactly what drove the Second Circuit's decision. 470 F.2d at 782

(stating that "New York and Illinois State law [providing for a privilege in this case], while not

conclusive[,] . . . reflect" concerns rooted in the First Amendment, and explaining those concerns

in greater detail).

All of the aforementioned courts ground the reporter's privilege, or some variant of the

privilege, in the First Amendment. *Gonzales* recognized, contrary to *McKevitt*, a First

Amendment reporter's privilege as to non-confidential information. *Gonzales*, 194 F.3d at 32.

The First-Amendment-based privileges and protections for reporters in civil cases developed in

*Cuthbertson* and *In re Grand Jury Proceedings* applied only to confidential sources. 810 F.2d at

_____

[4](...continued)
applicable state law provides such a basis for the privilege. *See infra* this Order section
(II)(A)(2).

584. As previously noted, the Seventh Circuit has declined to recognize a reporter's privilege based on the First Amendment. This Court follows the Seventh Circuit's lead by refusing to tread new legal ground.

Even if these cases did not use the First Amendment as the basis of the reporter's privilege, this Court would not endorse them. The Seventh Circuit has chosen not to recognize a privilege with moorings independent of the First Amendment, and, without any guidance by Possley, this Court declines to do so here.

To further support his contention, Possley cites several cases that *McKevitt* did not: *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981); *Silkwood v. Kerr-McGee Corp.*, 563 F.2d 433, 437 (10th Cir. 1977); and *Cervantes v. Time, Inc.*, 464 F.2d 986, 992 n.9 (8th Cir. 1972). (Possley's Mem. in Supp. or Mot. 12 n.3.) Yet, none of these cases divorce the federal reporter's privilege from the First Amendment. *Zerilli*, 656 F.2d at 708-09, 710-12 (distinguishing *Branzburg* and holding the First Amendment does not bar a federal reporter's privilege in civil cases where subpoena seeks confidential sources), and *Silkwood*, 563 F.2d at 434, 437-38 (discussing the federal reporter's privilege as to confidential sources in the context of the First Amendment), explicitly grounded the reporter's privilege as to confidential sources in the First Amendment. *Cervantes*, on the other hand, noted that, at least in libel cases, courts should "inquir[e] into the substance of the libel allegation" before requiring disclosure of an anonymous news source, finding support for this proposition in the First Amendment. 464 F.2d at 993; *see id.* at 992-993 nn.9-10 (acknowledging the *Branzburg* did not create a blanket privilege but nevertheless touched on First Amendment concerns in holding that a reporter's privilege may apply to anonymous sources in a libel case). This is not a libel case, and, as previously noted, the

-11-

Seventh Circuit has chosen not to recognize a First Amendment reporter's privilege as to

confidential information. Furthermore, *McKevitt* foreclosed the possibility of a federal reporter's

privilege grounded in the First Amendment when the information or source at issue, as in this

case, is not confidential. *McKevitt*, 339 F.3d at 533. For these reasons, this Court rejects

Possley's argument that a federal reporter's privilege requires this Court to quash or modify the

Subpoena.

### 2.    Illinois Reporter's Privilege

Although no federal reporter's privilege applies this case, Possley argues that the Illinois

Reporter's Privilege Act ("IRPA") protects him. (Possley's Mem. in Supp. of Mot. 11-15 (citing

735 ILL. COMP. STAT. § 5/8-901, 8-907(2) (2008)).) Unfortunately for Possley, the district court

in this case has federal-question jurisdiction, and *McKevitt* expressly held that "[s]tate-law

privileges[, like the IRPA,] are not 'legally applicable' in federal-question cases like[ ] this one."

339 F.3d at 533; *see Mosley v. City of Chicago*, 252 F.R.D. 421, 424-25 (N.D. Ill. 2008); *see*

*Solaia Tech., LLC v. Rockwell Automation, Inc.*, No. 03-6904, 2003 WL 22597611, at *2 (N.D.

Ill. Nov. 10, 2003). Further, the *McKevitt* court stated that, even if the privilege applied, which

*the court held it did not*, the reporters waived the privilege by failing to raise and discuss the

issue at the proper time. 339 F.3d at 533; *see Mosley*, 252 F.R.D. at 424-25. Therefore,

Possley's suggestion that "the [*McKevitt*] court expressly declined to consider 'why the [Illinois

Reporter's Privilege] statute should apply' because 'the reporters waived reliance on it'" is patently

false. (Possley's Mem. in Supp. of Mot. 13 (quoting *McKevitt*, 339 F.3d at 533).) Accordingly,

this Court rejects Possley's argument that the IRPA applies and protects him.

**B.    Reasonableness and Federal Rule of Civil Procedure 45(c)**

Since there is no applicable federal or state reporter's privilege, this Court determines, pursuant to *McKevitt*, whether the Defendants' Subpoena was "reasonable under the circumstances." 339 F.3d at 533.  In so doing, the Court addresses Possley's arguments that Defendants' Subpoena should be quashed or limited under Rule 45(c) because it does not "establish the relevancy of the information sought from a non-party" (Possley's Mem. in Supp. of Mot. 6.), and because it imposes an "undue burden" on him (*Id.* at 8-11).  Since both of these arguments involve Rule 45(c), the Court addresses them in this section.

Federal Rule of Civil Procedure 45(c) protects individuals subject to a subpoena.  It provides that, "[o]n a timely motion, the issuing court must quash or modify a subpoena that . . . subjects a person to an undue burden." FED. R. CIV. P. 45(c)(3)(iv).  Issues regarding subpoenas and Rule 45(c) arise during discovery.  The Seventh Circuit has noted that "pretrial discovery is a fishing expedition and one can[not] know what one has caught until one fishes." *Northwestern Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 931 (7th Cir. 2004).  Even so, the party must angle in a lake that contains at least some fish. *Id.*  Thus, when a party objects to a subpoena under Rule 45(c), the subpoenaing party must "justify [its] pursuit." *Patterson*, 2005 WL 43240, at *1 (citing *Northwestern Mem'l Hosp.*, 362 F.3d at 931).

To what extent a subpoenaing party must "justify [its] pursuit" turns, at least in part, on whether the individual subpoenaed is a party: "non-parties are entitled to somewhat greater protection" than parties. *Id.*  While "[t]hat protection encompasses . . . administrative hardship[s] . . . [and] interests that enforced production would compromise or injure," *id.*, it cannot rise to the level of a First Amendment privilege for journalists. *McKevitt*, 339 F.3d at 532-34.  In other

words, the "somewhat greater protection" given to a non-party does not make all subpoenas directed at journalists per se unreasonable. *See Hobley v. Burge*, 223 F.R.D. 499, 504 (N.D. Ill. 2004) (denying motion to quash subpoena as it applied to plaintiff's letters received by the reporter while reporter investigated incidents involving plaintiff).

This Court bears these considerations in mind when determining whether a subpoena is "reasonable under the circumstances" or imposes an undue burden. Analogous cases assist this Court in determining whether the Defendants' Subpoena satisfies this standard. Possley primarily cites for support two written decisions in this District addressing this issue post-*McKevitt*:[5] *Patterson*, 2005 WL 43240, at *5, and *Hobley*, 223 F.R.D. at 504. (Possley's Mem. in Supp. of Mot. 6, 9-11.) In *Patterson*, plaintiff sued CPD officers for claims arising out of his arrest on federal drug and weapons charges. 2005 WL 43240, at *1. Defendants subpoenaed several news organizations that had interviewed plaintiff, but the court quashed the subpoena. *Id.* at *2, 5. The court stated that "[t]he justifications defendants have advanced for these subpoenas are meager, to say the least, and consist largely of arguing . . . that the material sought may contain relevant information." *Id.* at *2. Although defendants believed they were entitled to discover non-confidential statements if they existed, they "suggest[ed] no basis for believing that there are statements other than those they already have." *Id.* The court feared that granting the subpoena would establish a standard where the party need show only relevance "and merely *possible*

---

[5] Possley also cites *Gulliver's Periodicals, Ltd. v. Chas. Levy Circulating Co., Inc.*, 455 F. Supp. 1197, 1199 (N.D. Ill. 1978), for support. (Possley's Mem. in Supp. of Mot. 7-8.) *Gulliver's Periodicals*, however, was decided prior to *McKevitt*, and embraced a First Amendment reporter's privilege only as to confidential sources. *Id.* at 1202. For those two reasons, *Gulliver's Periodicals* does not apply.

usefulness," which would jeopardize the independence of news organizations.[6] *Id.* at *3

(emphasis in original).

In *Hobley*, plaintiff sued the police officers of the CPD for, among other things, torture. During his incarceration, plaintiff communicated with a journalist from the CHICAGO READER, who had investigated and published articles on police brutality in Chicago for fifteen years. 223 F.R.D. at 500. Some of these articles discussed plaintiff's torture allegations. *Id.* at 500-01. During the course of these communications, plaintiff sent two letters to the journalist, who also took notes when he interviewed plaintiff. *Id.* The journalist later wrote two articles about plaintiff, though these articles did not refer to "his meeting or conversations with [plaintiff] or to any letters that he received from [plaintiff]." *Id.* at 500. While writing these articles, the journalist had a telephone conversation with plaintiff during which he recorded notes. *Id.* at 500-01. He also received a third letter from plaintiff. *Id.* at 501. These articles were "instrumental in drawing both public and official attention to those allegations." *Id.*

During discovery, defendants caused a subpoena duces tecum to be served on the journalist. *Id.* at 501. The subpoena sought numerous documents, but defendants eventually narrowed the subpoena's scope to plaintiff's letters and the journalist's notes. *Id.* at 501-02. The

---

[6] The *Patterson* court weighed First Amendment considerations when making its decision, specifically stating that "[t]he kind of discovery requested here not only burdens the news organizations but burdens the public interest in a robust press." 2005 WL 43240, at *3. This Court does not disagree that First Amendment concerns might play a role in the Rule 45(c) analysis for confidential information obtained by non-party journalists. *See McKevitt*, 339 F.3d at 532 (rejecting the First Amendment as the source of a reporter's privilege explicitly only as to non-confidential sources). But whether explicitly declared or implicitly condoned, First Amendment considerations cannot rise to the level of a federal reporter's privilege. *Id.* To the extent that *Patterson* may be read to support such a privilege and make an end-run around *McKevitt*'s holding, this Court cannot endorse or follow the decision.

journalist filed a motion to quash the subpoena under Rule 45(c). *Id.* at 501. The court granted

the motion as to the journalist's notes but denied it as to plaintiff's letters. *Id.* at 504-05. As to

the letters, the court stated that "the practical burden of production on [the journalist] is limited."

*Id.* at 504. The court also noted that, "[b]ecause [the letters] consist of [plaintiff's] own

statements, they may be fodder for cross-examination or lead to other admissible evidence." *Id.*

Additionally, the court considered the non-confidential nature of the letters, as well as the fact

that the reporter did not solicit them. *Id.*

As to the reporter's notes, however, the court stated that "[their] only value . . . to . . .

[defendants] is the possibility that they *might* reflect something that [plaintiff] said to [the

journalist] that *might* be helpful to . . . [d]efendants." *Id.* at 505 (emphasis in original).

Moreover, the court stated that the journalist made one of his notes "during a telephone

conversation *about* [plaintiff]; [the journalist] [did] not even recall whether he was speaking to

[plaintiff] or to someone else." *Id.* (emphasis in original). Additionally, the court distinguished

*McKevitt* on the ground that "*McKevitt* did not discuss the subject of reporters' notes." *Id.* For

those reasons, the court granted the motion to quash as to the notes.

In this case, the Court finds that Defendants' Subpoena is reasonable under the

circumstances and does not impose an undue burden on Possley. Here, Defendants seek to

depose Possley because he "provided Siler with purported facts that led her to question and

ultimately to recant her original identification of [Plaintiff]." (Defs.' Am. Resp. to Possley's

Mem. in Supp. of Mot. 7.) Unlike the justifications for the subpoena in *Patterson*, the

justifications proffered here are not "meager." *Patterson*, 2005 WL 43240, at \*2. Defendants in

this case *have* "suggest[ed] [a] basis for believing that there are statements other than those they

already have." *Id.* Defendants do not know the exact statements that Siler made to Possley and

assert that Possley even denies one statement Defendants claim she made. (Defs.' Am. Resp. to

Possley's Mem. in Supp. of Mot. 5.) Furthermore, Possley was the first individual to inform

Siler of Plaintiff's exoneration. (Possley's Mem. in Supp. of Mot. 2, Ex. A at ¶ 5.) In response,

Siler apparently recanted her identification testimony, which had helped convict Plaintiff of

attempted murder. (*Id.*) These same facts also distinguish this case from *Hobley*, where the

court found that the subpoenaed information *might* have been relevant to Plaintiff's case.

Possley's deposition *will* be relevant; indeed, it "may be fodder for cross-examination [of Siler or

Possley] or lead to other admissible evidence." *Hobley*, 223 F.R.D. at 505; (Defs.' Am. Resp. to

Possley's Mem. in Supp. of Mot. 2, 4, 5; *see generally* Am. Compl.). Furthermore, no notes are

at issue in this case.

Contrary to Possley's argument, Defendants have shown that the information Possley

possesses is more than "merely relevant" to this case. (Possley's Mem. in Supp. of Mot. 6-8.)

Possley's interviews with Siler, and Siler's subsequent reactions to Possley's statements, are

crucial to this case. Defendants will likely use Siler's statements when crafting their defenses to

Plaintiff's claims, such as malicious prosecution. In Illinois, two of the five elements required to

prove malicious prosecution are lack of probable cause and malice. *Aguirre v. City of Chicago*,

382 Ill. App. 3d 89, 96 (1st Dist. 2008) ("To prove the tort of malicious prosecution, a plaintiff

must demonstrate[ ] [that] (1) . . . defendants began or continued the original criminal

proceeding; (2) plaintiff received a favorable termination; (3) probable cause did not exist; (4)

malice was present; and (5) plaintiff suffered damages." (citing *Swick v. Liautaud*, 169 Ill.2d 504,

512 (1996))). Possley's deposition will either confirm or cast doubt on Siler's statements, which,

-17-

in turn, may (or may not) show that Defendants lacked probable cause or acted with malice.

Furthermore, Plaintiff has acknowledged that he may call Possley as a witness. (Possley's Mem. in Supp. of Mot., Ex. E at 11-12.) Possley has some identifiable information that is more than merely relevant, even if one cannot identify with precision all of information Possley may possess.

For similar reasons, this Court cannot impose limits on the deposition, as Possley suggests it should. (Possley's Mem. in Supp. of Mot. 7-8.) Because this Court does not know where the information revealed in the deposition will lead, it cannot limit the deposition to particular subjects or issues. But Possley's deposition is not limit*less*, at least in the sense that Possley employs the word, because the Federal Rules of Civil Procedure govern and limit depositions. *See* FED. R. CIV. P. 30(c)-(d). Under the Federal Rules, Possley's attorney may object to questions "concisely in a nonargumentative and nonsuggestive manner," and "may instruct the deponent not to answer . . . when necessary to preserve a privilege . . . or to present a motion under Rule 30(d)(3)." FED. R. CIV. P. 30(c)(2). Additionally, if Possley is anxious about the length of the deposition, he need not wring his hands: the Federal Rules of Civil Procedure provide adequate safeguards against temporal burdens. FED. R. CIV. P. 30(d)(1) ("Unless otherwise stipulated or ordered by the court, a deposition is limited to 1 day of 7 hours.").

In determining whether the Subpoena is reasonable under the circumstances, this Court considered Possley's status as a non-party journalist. Although the Court finds that Possley's status entitles him to "somewhat greater protection," this does not require the Court to quash the Subpoena or limit the scope of the deposition here. To find, in this case, that the Subpoena is not reasonable under the circumstances, or that it imposes an undue burden on Possley, would be

tantamount to promulgating a First Amendment federal reporter's privilege with respect to non-

confidential information. That is contrary to *McKevitt* and thus the time-honored judicial

principle of *stare decisis*, *Randall v. Sorrell*, 548 U.S. 230, 243 (2006) ("The Court has often

recognized the 'fundamental importance' of *stare decisis*, the basic legal principle that commands

judicial respect for a court's earlier decisions and the rules of law they embody."), both of which

work together to bind this Court. Therefore, the Court concludes that Defendants' Subpoena is

reasonable under the circumstances and does not impose an undue burden on Possley.

### III. Conclusion

For the foregoing reasons, this Court denies Possley's Motion in its entirety.


**ENTER ORDER:**


**MARTIN C. ASHMAN**
United States Magistrate Judge

Dated: March 20, 2009