**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT WILSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07 C 3994 |
| | ) | |
| JAMES O'BRIEN, et al., | ) | The Hon. Charles P. Kocoras |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S LOCAL RULE 56.1(b)(3)(C) STATEMENT OF
ADDITIONAL FACTS THAT REQUIRE DENIAL OF SUMMARY JUDGMENT**

Plaintiff Robert Wilson, by his undersigned attorneys, submits this statement of additional facts that require denial of the defendants' motion for partial summary judgment in accordance with Local Rule 56.1(b)(3)(C).

**ADDITIONAL FACTS**

**I.      Additional Facts Regarding the Attack on June Siler and Jerryco Wagner.**

1.   Plaintiff Robert Wilson is innocent of the February 28, 1997 attack on June Siler at the bus stop located at 2851 South King Drive. On October 30, 2008, Plaintiff was formally pardoned by the Governor of the State of Illinois and his record expunged on the basis of a gubernatorial finding of innocence. *See* Certificate of Pardon on the Ground of Innocence, Oct. 30, 2008 (attached as Ex. A).

2.   Jerryco Wagner has admitted that he was the one who committed that attack. *See* Jerryco Wagner Dep. Tr., Feb. 25, 2010 (excerpts attached as Ex. B) at 15-20.

3.   June Siler's description of her attack, included the following characteristics:

   a. Siler was attacked at a bus stop located at 2851 South King Drive in Chicago. General Offense Case Report, Feb. 28, 1997 (attached as Ex. C).

    b. Her attacker approached her from behind. June Siler Dep. Tr., Nov. 11, 2008 (excerpts attached as Ex. D) at 206

    c. Siler's attacker grabbed her and slashed her in the throat. *Id.*

    d. The weapon used was a box cutter. *Id.*

    e. Following the attack, the perpetrator fled on foot. *Id.* at 207.

    f. Siler provided the authorities with a description of her attacker that, among other things, included the information that her assailant was wearing black shoes that fastened with Velcro straps. *Id.* at 177.

    g. Siler also told the authorities that that her attacker was a male black in his early 20s; short with a slender build; and wearing a mustache. Siler described the offender as dressed in a black coat and wearing a skull cap. General Progress Report, Mar. 1, 1997 (attached as Ex. E) at 9, 12; Daniel McInerney Dep. Tr., June 4, 2009 (excerpts attached as Ex. F) at 31-3; Leonard Thomas Rolston Dep. Tr., April 29, 2009 (excerpts attached as Ex. G) at 19-20.

4. At the time of his arrest on March 1, 1997, Plaintiff was 41 years of age. *See* Arrest Report, Mar. 2, 1997 (attached as Ex. H). Plaintiff was not wearing Velcro shoes. John Halloran Dep. Tr., Mar. 4, 2010 (excerpts attached as Ex. I) at 39.

5. Jerryco Wagner was arrested on March 15, 1997. He is a black male. At the time of his arrest, Wagner was 21 years of age; he was 5 feet 7 inches tall and weighed 140 pounds. Arrest Report re Jerryco Wagner (attached as Ex. J). A photograph of Wagner taken following a lineup in which he stood on the day of his arrest shows that Wagner is wearing Velcro shoes. Photographs of Jerryco Wagner (attached as Ex. K); Kulmeet Galhotra Dep. Tr., Apr. 28, 2009 (excerpts attached as Ex. KK ) at 41; Kulmeet Galhotra Affidavit, Oct. 22, 2001 (attached as Ex. LL).

6. Wagner was arrested as he fled following an attack upon one Melanie Hopp outside the Holy Angels Church at 605 East Oakwood. Wagner had approached Hopp from the rear; stabbed her twice in the neck; and then fled on foot. At the time of his arrest, Wagner was in possession of a serrated steak knife. Supplementary Police Report re Attempted Murder of Melanie Hopp (RD # B157491), Mar. 25, 1997 (attached as Ex. L); Supplementary Police Report re Attempted Murder of Melanie Hopp (RD # B157491), Mar. 16, 1997 (attached as Ex. M).

7. In interviews following his arrest, Wagner stated that he had attacked Hopp because God had ordered him to kill white people. *Id.* Chicago Police reports reflect that Wagner also readily admitted to having committed the following additional attacks, all because of a command from God to attack white people:

> a. On March 1, 1997 at 8:20 p.m., Wagner attacked one Manuel Guzman at a bus stop located at 3500 South King Drive. He approached Guzman from the rear; grabbed him; stabbed him in the neck with a knife; and fled on foot. Supplementary Police Report re Aggravated Battery of Manuel Guzman (RD # B128448), Mar. 16, 1997 (attached as Ex. N).
>
> b. On March 3, 1997 at 4:00 p.m., Wagner attacked two young women, Virginia Johnson and Elizabeth Weinstein, as they were making a film at 400 East 39th Street. He approached the women from the rear; stabbed the first victim in the head, neck and back; stabbed the second victim in the right leg as she screamed and attempted to summon help. Wagner then fled on foot. Supplementary Police Report re Aggravated Battery of Virginia Johnson and Elizabeth Weinstein (RD # B132178), Mar. 16, 1997 (attached as Ex. O).
>
> c. On March 4, 1997 at 8:00 p.m., Wagner attacked an elderly white woman, Margarita Harwell, at 339 East 34th Street. He approached Harwell from the rear;

stabbed her once in the left shoulder; and then fled on foot. General Offense Case Report re Aggravated Battery of Margarita Harwell, Mar. 5, 1997 (attached as Ex. NN); Supplementary Police Report re Aggravated Battery of Margarita Harwell (RD # B134881), Mar. 16, 1997 (attached as Ex. P).

    d.  On March 14, 1997 at 6:15 a.m., Wagner attacked a white male, Ivan DeLeon, as he waited for a bus at 30 South Wacker Drive. He approached DeLeon from behind; stabbed him at the base of the neck and in the left shoulder; and fled on foot. General Offense Case Report re Aggravated Battery of Ivan DeLeon, Mar. 15, 1997 (attached as Ex. JJ); Supplementary Police Reports re Aggravated Battery of Ivan DeLeon (RD # B154914), Mar. 19, 1997; Mar. 22, 1997 (attached as Ex. R).

    e.  On March 14, 1997 at 3:30 p.m., Wagner attacked a white male, Matthew Cannon, as he was conducting a security check around the outside perimeter of the Carson Pirie Scott store, at 1 South State Street. Wagner approached Cannon from behind; stabbed him once in the right side of his neck; and fled on foot. General Offense Case Report re Aggravated Battery of Matthew Cannon, Mar. 15, 1997 (attached as Ex. MM); Supplementary Police Report re Aggravated Battery of Matthew Cannon (RD # B157975), Mar. 18, 1997 (attached as Ex. Q).

8. At the time of Wagner's arrest, Plaintiff had already been arrested; Siler had identified Plaintiff as her attacker; Plaintiff had signed a confession to the crime; and criminal proceedings against Plaintiff based on the identification and the confession had already commenced. *See* Defendants' Local Rule 56.1(a)(3) Statement, ¶¶ 13, 17, 33 and 35.

9. Detective Edward Triggs (now deceased) was one of the detectives assigned to the investigation of the attack on June Siler and he conducted an interview of a witness early in

4

the investigation. *See* Supplementary Police Report of Edward Triggs, Mar. 1, 1997 (attached as Ex. S). Triggs was also assigned to the investigation of the attempted murder of Melanie Hopp. Supplementary Report re Melanie Hopp, Mar. 16, 1997 (attached as Ex. M).

10. Defendant Gerard Carroll has testified that, upon learning of Wagner's arrest, Carroll asked Triggs whether Triggs had questioned Wagner concerning whether Wagner had committed the Siler attack. Gerard Carroll Dep. Tr., Sept. 16, 2008 (excerpts attached as Ex. T) at 284-87.

11. According to Carroll, Triggs informed him that the Siler case was the first one that Wagner had been asked about and that Wagner had denied committing that attack. *Id.*

12. Wagner has testified that he was questioned about the attack on Siler by a white detective who was "kind of tall" and that he admitted to the crime, telling the detective everything he remembered about the attack. Wagner Dep. Tr. (excerpts attached as Ex. B) at 36-45.

13. There is no Chicago Police report documenting an interview of Wagner on the subject of the June Siler attack. There is also no report indicating that Wagner admitted to the Siler attack when he was interviewed by the police on March 15, 1997. *See*, *e.g.*, Supplementary Police Report (RD # B126088), Mar. 12, 1997 (attached as Ex. HH).

**II.    Additional Facts Regarding the Interrogation of Robert Wilson.**

14. At the time of his arrest, Defendants O'Brien, Carroll, and Halloran conducted a pat down search of Plaintiff. They located a folding knife that Plaintiff possessed at that time, but failed to find a handgun that Plaintiff was carrying in an interior jacket pocket. Robert Wilson Dep. Tr., Nov. 7, 2008 (excerpts attached as Ex. U) at 191-94. The defendants first discovered the gun when Plaintiff displayed it to them as they were conducting a second pat

5

down of him in an interview room at Area 1 police station. Robert Wilson Dep. Tr., Jan. 15, 2009 (excerpts attached as Ex. V) at 236-37.

15. Initially, Plaintiff was questioned repeatedly concerning his whereabouts throughout the day on February 28. Plaintiff responded to these questions. Wilson Dep.Tr., Nov. 7, 2008 (attached as Ex. U) at 206-07.

16. One of the officers then escorted Plaintiff to a different location and took six Polaroid photographs of Plaintiff: two views of Plaintiff's left and right profile and two views of Plaintiff's face. *Id.* at 207-08. Two of those photographs are in the record: a view of Plaintiff's face in which he is wearing a skull cap and a view of Plaintiff's face in which he is hatless. Carroll Dep. Tr. (excerpts attached as Ex. T) at 175-76; Photographs of Robert Wilson (attached as Ex. W)

17. At a point following the taking of his photograph, Plaintiff recalls that he was interviewed by a female Assistant State's Attorney regarding the Siler attack. He denied committing the offense. Wilson Dep. Tr., Nov. 7, 2008 (excerpts attached as Ex. U) at 210-11; Wilson Dep. Tr., Jan. 15, 2009 (excerpts attached as Ex. V) at 243-47.

18. The female Assistant State's Attorney referred to in the preceding paragraph was Ursula Walowski, who interviewed Plaintiff following her interview of June Siler and thereafter approved charges against Plaintiff. *See* Defendants' Local Rule 56.1(a)(3) Statement, ¶¶ 18, 20, 24.

19. At a later point, Defendant O'Brien and two other officers whom Plaintiff could not name entered the interview room and asked Plaintiff to consent to a search of his home. Wilson Dep. Tr., Jan. 15, 2009 (excerpts attached as Ex. V) at 253-57. Plaintiff signed a written Consent to Search form, which was also signed by Defendant William Moser as a witness. William Moser Dep. Tr., Jan. 27, 2009 (excerpts attached as Ex. X) at 89-91; Defendants' Ex. Q.

6

It is normal police procedure that the witnessing party sign the form in the presence of the person consenting. *Id*. at 90.

20. Plaintiff requested that the officers who obtained his consent to search bring him his blood pressure medication and described for them where the medication was located in his home. Wilson Dep. Tr., Jan. 15, 2009 (excerpts attached as Ex. V) at 257-58. Plaintiff was required to take the medication (Procardia) every eight hours and had last taken it in the morning on the day of his arrest. Wilson Dep. Tr., Nov. 7, 2008 (excerpts attached as Ex. U) at 164, 197-98.

21. Defendants Moser and Albert Graf left the station to search Plaintiff's apartment in the Henry Horner Extension at 1814 West Monroe. Moser Dep. Tr. (excerpts attached as Ex. X) at 93-4.

22. At no time while he was in police custody was Plaintiff provided with the blood pressure medication that he had requested. Wilson Dep. Tr., Jan. 15, 2009 (excerpts attached as Ex. V) at 377.

23. As his stay in police custody progressed, Plaintiff became increasingly ill and disoriented because of his asthma and high blood pressure. *Id.* at 284.

24. After his admission to the Cook County Jail (on March 3, 1997), Plaintiff was treated for hypertension and for asthma and put on an IV. *Id.* at 330-31. Among other things, doctors there prescribed Procardia, the blood pressure medication that Plaintiff had not been provided while he was in police custody. *Id*.

25. Following ASA Walowski's approval of charges and Plaintiff's consent to the search of his apartment, Plaintiff was removed from the upstairs interview room and taken to a basement lockup area, where, according to police records, he remained from 3:30 a.m. on March 2nd until 5:30 p.m. on that same date. *Id.* at 261-64; Arrest Report (attached as Ex. H) at 2.

26. In the lockup, Plaintiff was offered a single bologna sandwich to eat—his only food since the time of his arrest. Wilson Dep. Tr., Jan. 15, 2009 (excerpts attached as Ex. V) at 264-66. He drank water from the sink in his cell. *Id.*

27. The lockup was cold and drafty. Plaintiff attempted to sleep during his hours in the lockup, but was unable to do so because of the cold and because he was afraid. *Id.* at 262, 265

28. The evening news shows on March 2nd included stories reporting on the fact that Plaintiff had been arrested and charged with the February 28th assault on June Siler at a CTA bus stop. Plaintiff's picture was displayed as part of that story. Kenneth Frost Dep. Tr., June 22, 2009 (excerpts attached as Ex. Y) at 211-18, 225.

29. Kenneth Frost saw the Siler story on the Channel 5 evening news on March 2nd and became convinced that Plaintiff was the person who had assaulted him three and a half weeks earlier, on February 4, 1997, on a CTA bus on the west side of Chicago near Pulaski and Grand. *Id.* at 58, 164, 225, 230.

30. Frost contacted the police and was brought to Area 1 to be interviewed and to view a lineup in which Plaintiff would participate. *Id.* at 212-13, 240-45, 267-68; Carroll Dep. Tr. (excerpts attached as Ex. T) at 229-31, 251-52. Plaintiff was later charged with aggravated battery for the Frost attack, after one of the defendants requested that the State press charges against him. William Healy Dep. Tr., May 28, 2008 (excerpts attached as Ex. Z) at 207.

31. Plaintiff was taken from the lockup to an upstairs interview room and then to a room with a two way mirror where a lineup was conducted. Wilson Dep. Tr., Jan. 15, 2009 (excerpts attached as Ex. V) at 276, 278, 286, 290-91.

8

32. In the lineup room, Plaintiff encountered four individuals who were to be fillers in the lineup and a police officer, whom Plaintiff had not seen before, who was sitting in a chair. *Id.* at 279-80, 291.

33. As he waited in the lineup room, Plaintiff was sick from the effects of asthma and hypertension. He experienced difficulty standing up. *Id.* at 284.

34. The officer sitting in the chair asked Plaintiff if he had ever seen a utility blade before and he pulled a plastic, thin utility blade with a black knob and a razor-like blade out of his pocket and began to demonstrate its operation to Plaintiff. *Id.* at 292-93.

35. The Chicago Police Supplementary Report lists defendant Warren Richards (along with Defendant Carroll) as an officer who was present with the lineup participants during the lineup. Supplementary Police Report re Lineup, Mar. 2, 1997 (attached as Ex. AA). While Richards has stated that he does not recall participating in the lineup, he also does not deny that he was in the room with the suspects, including Plaintiff, during the procedure. Warren Richards Dep. Tr., Apr. 30, 2009 (excerpts attached as Ex. BB) at 58.

36. Defendant Richards was also listed as an "Arresting and Assisting" detective on the Wilson arrest report pertaining to the Frost attack (Arrest Report (attached as Ex. H) at 3), as well as a contributing officer in the final report documenting the Siler investigation. *See* Supplementary Police Report (RD # B126088) (attached as Ex. HH) at 4.

37. Following the lineup, Defendant O'Brien informed Plaintiff that "the victim" had identified him. O'Brien did not name the victim and Plaintiff assumed that he was referring to the nurse, about whom Plaintiff had been questioned the previous day. Wilson Dep. Tr., Jan. 15, 2009 (excerpts attached as Ex. V) at 294.

9

38. O'Brien and the police officer who had demonstrated the utility blade brought Plaintiff to an interview room where O'Brien began to aggressively accuse Plaintiff of committing the attack on June Siler and to demand that he confess to the crime. *Id.* at 296-99.

39. In the course of this interrogation, Defendant O'Brien repeatedly struck Plaintiff on the side of the head. *Id.* at 298. Plaintiff continued to maintain his innocence. *Id.*

40. O'Brien is a large man. He is 6'5" tall and, in the mid-1990s, weighed at least 230 pounds. James O'Brien Dep. Tr., Feb. 17, 2010 (excerpts attached as Ex. CC) at 21-2; James O'Brien Dep. Tr. in *Wiggins v. Burge,* Jul. 16, 1996 (excerpts attached as Ex. DD) at 22.

41. According to the arrest report, Plaintiff was 5'7" and weighed 130 pounds at the time of his arrest. Arrest Report (attached as Ex. H) at 1

42. O'Brien and the other officer left the room and, after a few minutes, Assistant State's Attorney William Healy entered the interview room and began to question Plaintiff. Healy told Plaintiff that he should confess because the police officers would likely beat him up if he did not. Healy also told Plaintiff that, if he confessed, Healy would be able to get him a deal whereby he would only serve a year in jail. Wilson Dep. Tr. Jan. 15, 2009 (excerpts attached as Ex. V) at 299-303.

43. Feeling that he was "fighting for his life," Plaintiff told Healy that he would sign a written statement confessing to the assault of June Siler. *Id.* at 304.

44. In this statement, he admitted to cutting Siler with a "utility blade" or a "utility knife." Statement of Robert Wilson Made to ASA Healy, Mar. 3, 1997 (attached as Ex. EE) at 4-7. He described the knife as a razor blade with a red plastic handle, and said that the handle had a "black knob on it" that could be used to "pop the blade out of the handle." *Id*. at 5.

10

45. Prior to signing a written confession, Plaintiff requested the opportunity to make a phone call and was refused permission to do so. Wilson Dep. Tr., Jan. 15, 2009 (excerpts attached as Ex. V) at 308-09.

46. Prior to signing a written confession, Plaintiff was not read his Miranda rights. *Id*. at 301.

47. Healy prepared a handwritten statement, which Plaintiff signed. As Healy was preparing the statement, Healy asked questions and Plaintiff concocted details regarding the crime, relying upon "hints" from Healy. *See id.* at 303-04, 307-15.

48. Healy, who helped to coerce Plaintiff's confession, testified on November 3, 1999 as one of the State's witnesses in Plaintiff's trial for the attempted murder of June Siler. During his testimony, Healy read Plaintiff's written statement to the jury. *See* Transcript of Proceedings, *People v. Robert Wilson*, Circuit Court of Cook County, Illinois, Case No. 97 CR 7359, November 3, 1999, Def. Ex. AA (Healy Testimony). Two days later, the jury returned a verdict finding Plaintiff guilty of Siler's attempted murder. Plaintiff was then sentenced to 30 years in prison.

**III. Additional Facts regarding June Siler's Identification of Plaintiff.**

49. Defendants O'Brien, Carroll, and Halloran took a photo array to June Siler on the evening of March 1, 1997, following Plaintiff's arrest. Carroll Dep. Tr. (excerpts attached as Ex. T) at 181-82, 186-87. According to the defendants, the photo array included four filler photographs and a single photograph of Plaintiff in which Plaintiff was not wearing a hat. *Id.* at 182-83. According to Siler, the photo array that the three defendants displayed to her contained two pictures of Plaintiff, one in which Plaintiff was hatless and the other in which Plaintiff (unlike all other persons in the array) was wearing a hat similar to the one worn by Siler's attacker. Siler Dep. Tr. (excerpts attached as Ex. D) at 94, 185-86, 208.

11

50. After informing defendants O'Brien, Carroll, and Halloran that Plaintiff appeared "too old" to be her attacker in the photograph in which he was not wearing a hat, one of the defendants reminded Siler she had never seen her attacker without a hat. *Id.* at 187-88. Siler then acknowledged that the photograph of Plaintiff wearing a hat "looked like" her attacker. *Id.* at 188. One of the defendants then told Siler she could not say "it looks like" him. *Id.* at 136, 189.

51. At that point Siler agreed to identify Plaintiff as her attacker. *Id.*

52. ASA Walowski, who approved the criminal charges against Plaintiff for the Siler assault, was not informed of any of these facts regarding the defendants' interactions with Siler. Ursula Walowski Dep. Tr., July 16, 2008 (excerpts attached as Ex. FF) at 36-41.

53. The Chicago Police records documenting the Siler investigation do not indicate that Siler was shown two photographs of Wilson in the photo array, or that she was encouraged to identify Wilson as her attacker. *See* Supplementary Police Report (RD # B126088) (attached as Ex. HH) at 9.

54. Plaintiff's criminal trial attorney in the Siler matter, Kulmeet Galhotra, did not know at any time during the criminal proceedings that the police had shown Siler two photographs of Plaintiff in the photo array, that Plaintiff was the only suspect wearing a hat in the array, or that Siler had not immediately identified Plaintiff as her attacker until she was prompted to do so by the police. Galhotra Dep. Tr. (attached as Ex. KK) at 29, 155-57, 160-65.

**IV. Additional Facts Regarding the Supervisory Role of Sergeant Fred Bonke**

55. As a supervising sergeant on the afternoon shift in the Area 1 Violent Crimes Division of the Chicago Police Department, Defendant Bonke's responsibilities included assigning detectives to cases; keeping track of the status of ongoing investigations; and maintaining overall responsibility for the detectives reporting to him. Fred Bonke Dep. Tr., May

12

1, 2009 (excerpts attached as Ex. GG) at 26-7, 32-5. As a matter of practice, he regularly consulted with detectives in charge of an ongoing investigation. *Id.* at 57-8.

56. In cases where a suspect was interrogated at Area 1, Bonke was aware of "who was brought in" for interrogation, "what they were there for," and who the detectives were who were responsible for the interrogation. *Id.* at 92-3.

57. Bonke had responsibility for ensuring that suspects in custody at the Area headquarters were given "all of the necessities," including adequate food, access to the restroom, and any necessary medication (as long as Bonke was aware of these needs). *Id.* at 93-5. Bonke was also responsible for knowing how long a suspect had been in an interview room. *Id.* at 95-6.

58. In the course of an interrogation, Bonke generally obtained updates from the interviewing detectives. For instance, Bonke may have ascertained whether a suspect had invoked his Fifth Amendment rights, whether he had requested an attorney, or whether he had confessed. *Id.* at 97-9. Bonke was responsible for ensuring the suspect was not left "to languish" in the interrogation room and that there were "sufficient charges" to proceed against him. *Id*. at 99. He was also "indirectly" responsible for ensuring that "no person's rights were violated while they were in the area," which required overseeing the actions of detectives under his command. *Id*. at 123.

59. Bonke assigned O'Brien, Carroll, and Halloran to the Siler investigation at the outset of the case. *Id.* at 40-1; Carroll Dep. Tr. (excerpts attached as Ex. T) at 58, 72-3.

60. Bonke's supervisory responsibilities included "ensuring the continuity of the investigation from shift to shift"—*i.e.,* from February 28, 1997 when Siler was attacked until March 3, 1997 when Plaintiff was charged with the crime. Bonke Dep. Tr. (excerpts attached as Ex. GG) at 105-06. In his supervisory role, Bonke apprised the "oncoming sergeant" of any

developments in the investigation, submitting either oral or written reports to the relieving officer. *Id*. at 106, 111, 150-51.

61. As supervising sergeant of the Siler investigation, Bonke maintained contact with the detectives working on the case throughout the course of the investigation. Carroll Dep. Tr. (excerpts attached as Ex. T) at 73. *See also* Supplementary Police Report (RD # B126088), Mar. 12, 1997 (attached as Ex. HH).

62. Bonke admitted at one point in his deposition that the detectives would have informed him when Plaintiff confessed to the Siler attack. Bonke Dep. Tr. (excerpts attached as Ex. GG) at 154.

63. The Chicago Police Supplementary Lineup Report viewed by Kenneth Frost lists Defendant Bonke as the "supervisor in charge" of the lineup. Supplementary Police Report re Lineup (attached as Ex. AA)

64. Bonke reviewed, signed and approved the principal Supplementary Report summarizing the events leading to Plaintiff's being charged for the Siler attack and the assault of Kenneth Frost. *See* Supplementary Police Report (RD # B126088) (attached as Ex. HH). Bonke's signature on that report reflected his approval of the presentation of the investigation. Bonke Dep. Tr. (excerpts attached as Ex. GG) at 157.

65. Bonke also reviewed, signed, and approved reports that the detectives generated during the course of the investigation, including General Progress Reports related to the Siler investigation and a memorandum summarizing the status of the investigation at the end of the afternoon shift on the first day of the investigation (all attached as Ex. E). *See* Bonke Dep. Tr. (excerpts attached as Ex. GG) at 106-08.

**V.      Additional Facts Regarding the Participation of Detectives William Moser and Albert Graf.**

66.     On February 28, 1997, Defendants Moser and Graf were assigned to assist Defendants O'Brien and Carroll with the Siler investigation. Moser Dep. Tr. (excerpts attached as Ex. X) at 77; Albert Graf Dep. Tr., Nov. 5, 2008 (excerpts attached as Ex. II) at 63-5. Moser and Graf, along with O'Brien and Carroll, responded to the crime scene where Siler was attacked. Moser Dep. Tr. (excerpts attached as Ex. X) at 49; Carroll Dep. Tr. (excerpts attached as Ex. T) at 58, 74-5; Graf Dep. (excerpts attached as Ex. II) at 64.

67.     While at the crime scene, Moser communicated with the "beat" officers, searched for physical evidence relating to the attack, and determined whether the crime lab had been notified. Moser Dep. Tr. (excerpts attached as Ex. X) at 51. The defendants also made sure that the crime scene was protected. Graf. Dep. Tr. (excerpts attached as Ex. II) at 67, 83.

68.     Later that night, after leaving the crime scene, Moser conducted a telephone interview with Wilma Lilly, who was an eyewitness to Siler's assault. Moser Dep. Tr. (excerpts attached as Ex. X) at 70-2.

69.     After initially accompanying Moser to the crime scene, Graf went to Michael Reese Hospital, where Siler had been treated immediately after the attack. Graf Dep. Tr. (excerpts attached as Ex. II) at 96-7. At the hospital, Graf interviewed the emergency room personnel who treated Siler. *Id*. at 97-102.

70.     Moser and Graf each recorded their witness interviews, as well as any other investigative updates, in a set of General Progress Reports. General Progress Reports (attached as Ex. E) at 3, 7, 10, and 11; Graf Dep. Tr. (excerpts attached as Ex. II) at 67-8, 73-7, 98, 100-102; Moser Dep. Tr. (excerpts attached as Ex. X) at 73-4. Police procedure was for these reports to be reviewed by the primary investigators; signed by the supervising sergeant; and then incorporated as part of the investigative file. General Progress Reports (attached as Ex. E); Graf

15

Dep. Tr. (excerpts attached as Ex. II) at 77-82; Moser Dep. Tr. (excerpts attached as Ex. X) at 74, 113.

71. On the evening of March 1, 1997, the second day of the Siler investigation, Moser and Graf volunteered to conduct surveillance of the area surrounding the crime scene. Moser Dep. Tr. (excerpts attached as Ex. X) at 79. Defendants O'Brien, Carroll, and Halloran also conducted surveillance during this same period of time. Moser Dep. Tr. (excerpts attached as Ex. X) at 81; O'Brien Dep. Tr. (excerpts attached as Ex. CC) at 143.

72. The surveillance campaign led to Plaintiff's arrest on the night of March 1, 1997. O'Brien Dep. Tr. (excerpts attached as Ex. CC) at 144-56; Halloran Dep. Tr. (excerpts attached as Ex. I) at 34-45; Carroll Dep. Tr. (excerpts attached as Ex. T) at 130-45; Wilson Dep. Tr., Nov. 7, 2008 (excerpts attached as Ex. U) at 176-97. Moser and Graf were listed as "Arresting and Assisting" detectives on the arrest report because of their involvement in the case. Arrest Report (attached as Ex. H); Moser Dep. Tr. (excerpts attached as Ex. X) at 84.

73. Moser and Graf were also listed as contributing officers in the final report documenting the Siler investigation. *See* Supplementary Police Report (RD # B126088) (attached as Ex. HH) at 4, 10.

                          Respectfully submitted,

                          **ROBERT WILSON**

                          By: Locke E. Bowman
                              One of his attorneys

**OF COUNSEL:**

Locke E. Bowman
Alexa Van Brunt
Roderick MacArthur Justice Center
Northwestern University School of Law
357 East Chicago Avenue
Chicago, Illinois 60611
(312) 503-0844; (312) 503-1272 (Fax)

J. Samuel Tenenbaum
Clinical Assistant Professor
Bluhm Legal Clinic
Northwestern University School of Law
357 East Chicago Avenue
Chicago, Illinois 60611
(312) 503-8576; (312) 503-8977 (Fax)

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that he served the foregoing document upon all persons listed in the attached service list via the court's CM/ECF system on Monday, December 13, 2010.

    /s/  Locke E. Bowman

## **SERVICE LIST**
Wilson v. O'Brien, et. al.
No. 07 CV 3994

Jordan E. Marsh
City of Chicago – Department of Law
30 North LaSalle Street, Suite 1720
Chicago, Illinois 60602
(312) 744-8362
(312) 744-8373 (Fax)
***On behalf of City of Chicago***

Joseph M. Polick
Senior Counsel
City of Chicago Corporation Counsel
30 North LaSalle Street, Suite 1720
Chicago, Illinois 60602
(312) 744-8335
(312) 744-8373 (Fax)
***On behalf of James O'Brien, Gerald Carroll,
John Halloran, Leonard Rolston, Daniel McInerney,
William Moser, Albert Graf, Fred Bonke and Warren Richards***