UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


ROBERT WILSON,                     )
                                   )
              Plaintiff,           )
                                   )
    vs.                            )              07 C 3994
                                   )
JAMES O'BRIEN et al,               )
                                   )
              Defendants.          )


## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

There are several motions before the court. Defendants James O'Brien, Gerard Carroll, John Halloran, the Estate of Edward Triggs,[1] William Moser, Albert Graf, Warren Richards, Fred Bonke, and the City of Chicago (collectively, "Defendants") move for partial summary judgment on Count II pursuant to Fed. R. Civ. P. 56. Defendants William Moser ("Moser"), Albert Graf ("Graf"), Warren Richards ("Richards"), and Fred Bonke ("Bonke") have each filed a motion for summary judgment on Counts I-VII. For the reasons set forth below, Defendants' motion for

---

[1] Defendant Edward Triggs was deceased at the time this action was instituted and his estate was joined as a defendant.

partial summary judgment is denied. The motions submitted by Moser, Graf, and Bonke are granted. Richards's motion is granted in part and denied in part.

## BACKGROUND

On February 28, 1997, June Siler ("Siler"), a nurse employed by Michael Reese Hospital, was attacked by a man wielding a box-cutter as she waited in a bus shelter at 2851 South King Drive in Chicago. Defendants James O'Brien ("O'Brien") and Gerard Carroll ("Carroll"), detectives with the Chicago Police Department at the time, responded to the scene of the incident and assumed primary responsibility for the investigation. Detectives Moser and Graf also responded to the scene of Siler's attack to assist O'Brien and Carroll. O'Brien and Carroll eventually left the crime scene to interview Siler at Northwestern Memorial Hospital ("Northwestern") but she was unavailable for questioning at the time they arrived. Moser and Graf initially remained at the bus shelter to protect the crime scene, communicate with beat officers, and search for physical evidence. Moser later conducted a telephone interview with an eyewitness while Graf interviewed witnesses at Michael Reese Hospital.

On the night of March 1, 1997, O'Brien, Carroll, Moser, Graf, and Detective John Halloran ("Halloran") were conducting surveillance of the bus stop where Siler had been attacked the night before. Later that night, O'Brien, Carroll, and Halloran approached Plaintiff Robert Wilson ("Wilson") as he waited at the bus stop. The

detectives performed a protective pat-down of Wilson and retrieved a folding knife. After recovering the knife, O'Brien, Carroll, and Halloran placed Wilson under arrest for unlawful use of weapons and transported Wilson to the Chicago Police Department's Area 1 station.[2] Though Moser and Graf were listed as assisting officers in the police report of Wilson's arrest, the two men did not personally approach Wilson or take him into custody. In the interview room at the police station, O'Brien, Carroll, and Halloran questioned Wilson about his whereabouts on February 28 and his possible involvement in the Siler attack. After some initial questioning, one of the detectives escorted Wilson out of the interview room and took some Polaroid pictures of Wilson. The detective took two photos of Wilson's face: one in which he is wearing a hat and one in which he is not.

After Wilson had his picture taken, O'Brien, Carroll, and Halloran assembled a photo array to show to Siler at Northwestern. The array included Wilson's photo as well as filler photos of other individuals. When confronted with the photos, Siler identified

---

[2] Though the parties agree that Defendants recovered a handgun from Wilson's person they dispute the time that police first discovered the weapon. Wilson testified that Defendants recovered the gun when they performed a second protective pat-down in the interview room at the police station while Carroll testified that he found the gun during the initial encounter at the bus stop. Though the dispute does not ultimately affect our decision on the instant motions, we nevertheless note the discrepancy here.

Wilson as her attacker.[3] The detectives then contacted the Cook County State's Attorney Felony Review Unit to send someone to interview Siler. Assistant State's Attorney Ursula Walowski ("Walowski") soon arrived at Northwestern and questioned Siler about her identification. Based on Siler's positive identification of Wilson and her own discussions with Siler, Walowski approved the filing of felony charges against Wilson for aggravated battery and unlawful use of weapons.

After Siler positively identified Wilson in the photo line-up, O'Brien, Carroll, and Halloran returned to Area 1 to interrogate Wilson further. At some point during the interrogation, O'Brien and two other officers asked Wilson to consent to a search of his home. Wilson agreed and signed a written Consent To Search form. The parties disagree as to whether Moser actually entered the interrogation room to obtain Wilson's consent. Moser testified that he could not recall ever being in the same room with Wilson but he signed the Consent To Search form as a witness and testified that normal police practice would be for the witness to sign the form in the consenting person's presence. Wilson also testified that, after granting consent to the search, he asked the detectives to bring him his blood pressure medication and described the location of the

_____

[3] The parties also dispute the format of the photo array and the nature of the discussions between O'Brien, Carroll, Halloran, and Siler during the presentation of the photos. As the particulars of the line-up (beyond which Defendants were involved) are not critical to our analysis, we only note the dispute here.

medication in his home. Carroll and O'Brien both deny that Wilson ever requested that the police retrieve his blood pressure medication during his questioning.

Moser and Graf conducted the search of Wilson's home and recovered nothing of evidentiary value. Wilson did not receive his blood pressure medication at any time during his stay at Area 1. Wilson testified that he became increasingly ill and disoriented over the course of his time at Area 1 as a result of not receiving his blood pressure medication. Defendants offer testimony from Carroll to dispute this; Carroll observed Wilson during this period and did not notice any problems with his health. Regardless of the state of Wilson's health during his time at Area 1, doctors treated him for hypertension when he was admitted to the Cook County Jail on March 3, 1997.

Wilson was eventually removed from the interview room and taken to a lock-up facility at Area 1 at approximately 3:00 a.m. on March 2, 1997. At 4:30 p.m. that same day, O'Brien, Carroll, and Halloran arrived back at Area 1 for the afternoon shift. Soon after entering the station, the three men learned that Kenneth Frost ("Frost") had seen a photo of Wilson on the evening news and had identified him as his assailant in an attack that occurred three weeks earlier. The Chicago Police brought Frost to Area 1 to be interviewed and to view a line-up. At 5:30 p.m. on March 2, Wilson was removed from the lock-up facility to be placed in a line-up. At 10:30 p.m., Frost viewed a live

line-up that included Wilson and four other individuals and again identified Wilson as his assailant.

The parties propound differing descriptions of what happened in the room where the line-up participants were displayed. Wilson testified that a police officer whom he had not seen before was seated in a chair in the line-up room. The officer asked Wilson if he had ever seen a utility blade before. As he asked this, he pulled a thin plastic utility blade with a black knob out of his pocket and began to demonstrate its operation to Wilson. Wilson has not positively identified this officer by name but has presented evidence to suggest that the person in question was Detective Warren Richards. O'Brien and Halloran both testified that Richards was in the room with the line-up participants. A police report regarding the line-up also lists Richards as an officer who was present with the lineup participants. For his part, Richards denied that he was the officer Wilson described but did not deny that he was in the room with Wilson.

The parties also dispute whether some of the Defendants questioned Wilson following the lineup. In Wilson's version of events, O'Brien and the police officer who showed him how the utility blade worked brought him back to the interview room. Wilson stated that, once back in the interview room, O'Brien began to aggressively accuse him of committing the attack on Siler and to demand that he confess to that crime. Wilson testified that O'Brien repeatedly struck him on the side of his head in the

presence of the unidentified officer. O'Brien denied that he interviewed Wilson about Siler or Frost on March 2, 2007, and also denied that he abused Wilson. Carroll testified that none of the detectives involved in the Siler or Frost investigations had any contact with Wilson during the time Wilson asserted O'Brien struck him.

Sometime after the lineup on March 2, Assistant State's Attorney William Healy ("Healy") entered the interview room to question Wilson. Healy eventually left the room with a signed statement from Wilson admitting to the Siler and Frost attacks and filed aggravated battery charges against Wilson for the Frost assault. The two side's accounts of the discussion between the two men differ markedly. According to Wilson, Healy told him he should confess because the police officers would likely beat him up if he did not. Healy also purportedly told Wilson that, if he confessed, Healy would be able to get him a deal where Wilson would only serve a year in jail. Wilson also said that Healy refused his request to make a phone call and did not read him his Miranda rights before he signed the statement at issue. Finally, Wilson testified that, as Healy prepared the handwritten statement, Wilson concocted details of the Siler attack on the basis of hints that Healy provided. Healy denied that he told Wilson he should confess, that he would only serve one year in jail, that he failed to read Wilson his Miranda rights, and that he provided Wilson with "hints" as to the circumstances of the Siler attack.

The detectives investigating the Siler and Frost attacks were supervised by Defendant Fred Bonke, a sergeant at Area 1. As supervising sergeant, Bonke's responsibilities included assigning detectives to cases; keeping track of the status of ongoing investigations; knowing which suspects were brought in for interrogation, which detectives were responsible for the interrogation, and how long the interrogation had been going on; and ensuring that all suspects were given the relevant necessities. Bonke maintained contact with the detectives working on the case throughout the course of the investigation; received, reviewed, and signed progress reports on the investigation; and notified other supervisors about developments in the Siler matter.

A few days after the Siler investigation ended, police arrested another individual, Jerryco Wagner ("Wagner"), after he stabbed Melanie Hopp ("Hopp") in the neck outside a church on Chicago's South Side. Wagner had a steak knife in his possession at the time of his arrest and admitted to a number of recent stabbing assaults. Detective Edward Triggs ("Triggs"), who had conducted a witness interview early on in the Siler matter, was one of the detectives assigned to investigate Hopp's attempted murder. Carroll testified that he asked Triggs whether he had questioned Wagner about the Siler attack and Triggs informed him that Wagner had denied committing the attack.

Wilson's trial in the Siler case began in November 1999 in the Circuit Court of Cook County. Wilson's confession was introduced as evidence against him on

November 3, 1999. During the defense's presentation, Wilson attempted to introduce evidence of Wagner's attacks in order to establish that Wagner, not Wilson, had attacked Siler. The court precluded Wilson from presenting evidence related to Wagner's attacks. On November 5, 1999, the jury convicted Wilson of the attempted murder of Siler.

Following unsuccessful appeals and post-conviction relief in Illinois courts, Wilson filed a petition for a writ of habeas corpus on January 13, 2006. On October 20, 2006, another judge of this court granted Wilson a writ of habeas corpus on the basis that Wilson's Sixth Amendment right to present a complete defense had been violated by the state court's refusal to admit evidence of Wagner's crimes. *Wilson v. Firkus*, 457 F. Supp. 2d 865, 889-90 (N.D. Ill. 2006). Siler subsequently recanted her identification of Wilson as her attacker. On November 30, 2006, the State chose not to initiate a new trial against Wilson and dismissed its appeal of the order granting the writ.

On July 17, 2007, Wilson filed suit against Defendants asserting claims under 42 U.S.C. § 1983 and Illinois law. Specifically, Wilson asserts four separate causes of action under section 1983: Count I requests damages for violation of his rights under the Due Process Clause of the 14th Amendment, Count II seeks relief for an alleged infringement of his Fifth and Fourteenth Amendment right to be free from compulsory self-incrimination, and Counts III and IV seek recovery for constitutional violations on

a conspiracy and failure to intervene theory, respectively. Wilson also alleges a number of state-law causes of action: Count V asserts an action for malicious prosecution, Count VI for civil conspiracy, and Count VII for intentional infliction of emotional distress. Defendants now move for partial summary judgment on Count II of Wilson's Complaint pursuant to Fed. R. Civ. P. 56. Moser, Graf, Richards, and Bonke have each filed a separate motion for summary judgment on Counts I-VII of the Complaint.

## LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when the evidence is such that a reasonable jury could find for the nonmovant. *Buscaglia v. United States*, 25 F.3d 530, 534 (7th Cir. 1994). The movant in a motion for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact by specific citation to the record; if the party succeeds in doing so, the burden shifts to the nonmovant to set forth specific facts showing that there is a genuine issue of fact for trial. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In considering motions for summary judgment, a court construes all facts and draws all inferences from the record in favor of the nonmoving party. *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 255 (1986). With these principles in mind, we turn to the Defendants' motions.

## DISCUSSION

We will discuss Defendants' motion for partial summary judgment as to Count II first before assessing the merits of the motions submitted by Moser, Graf, Richards, and Bonke on an individual basis.

## I. Defendants' Motion For Partial Summary Judgment

Defendants argue that they are entitled to summary judgment on Count II of Wilson's Complaint because the claim is time-barred. Section 1983 does not have an express statute of limitations, so courts look to the forum state's statute of limitations for personal injury actions to determine the relevant limitations period for claims under § 1983. *Ashafa v. City of Chicago*, 146 F.3d 459, 461 (7th Cir. 1998). "In Illinois, the statute of limitations for § 1983 claims is two years." *Dominguez v. Hendley*, 545 F.3d 585, 588 (7th Cir. 2008) (citing 735 ILCS § 5/13-202). Though state law sets the limitations period for § 1983 claims for constitutional torts, federal law determines when they accrue. *Savory v. Lyons*, 469 F.3d 667, 672 (7th Cir. 2006).

The question of whether Wilson filed his action in a timely manner depends on whether the Supreme Court's holding in *Heck v. Humphrey*, 512 U.S. 477 (1994) applies to Wilson's claim or not. In *Heck*, the Supreme Court held that the limitations

period for "a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence" does not begin to run until the conviction or sentence has been invalidated. *Id*. at 489-90. Earlier in the opinion, the court explained that a state prisoner presents a cause of action for damages resulting from an unconstitutional conviction when the prisoner's suit would, if successful, "necessarily imply the invalidity of [the plaintiff's] conviction or sentence[.]" *Id*. at 487.

Our initial assessment suggests that *Heck* controls the start of the limitations period for Wilson's coerced confession claim because a finding in his favor would necessarily imply the invalidity of his conviction. In Count II, Wilson alleges that Defendants violated his Fifth and Fourteenth Amendment right to be free from compulsory self-incrimination by using physical abuse to extract an inculpatory statement from him which was later introduced at trial. Wilson's statement played a central role in securing his conviction in the Siler case. *See Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) ("the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him"). Defendants do not contend that the prosecution submitted other evidence of Wilson's guilt such that he would have been convicted even without his statement. Without some basis to conclude otherwise, we find that Wilson's coerced confession claim would have necessarily implied the

invalidity of his conviction and, therefore, Wilson could not have filed his claim until his conviction was set aside in 2006.[4]

Despite the apparent applicability of *Heck* to Wilson's action, Defendants contend that *Heck* does not control based on the Supreme Court's reasoning in *Wallace v. Kato*, 549 U.S. 384 (2007). In *Wallace*, the Court held that:

> "the statute of limitations upon a § 1983 claim seeking damages for a false arrest in violation of the *Fourth Amendment*, where the arrest is followed by criminal proceedings, begins to run at the time the claimant becomes detained pursuant to legal process."

*Id*. at 397. In reaching this conclusion, the Court rejected the argument that the *Heck* rule applied to the plaintiff's false arrest claim. The *Wallace* Court centered this portion of its analysis on the similarities between the plaintiff's false arrest claim and the common-law tort claim for false imprisonment. *Id*. at 388-90. Specifically, the Court determined that the limitations period for a section 1983 false arrest claim (like its common-law equivalent) always begins at the moment legal proceedings are first

---

[4] Defendants mistakenly argue that all section 1983 actions based on constitutional violations which are reviewed under a harmless error standard are not subject to the delayed accrual rule of *Heck*. Their contention is based on a footnote in the Court's opinion. *See Heck*, 512 U.S. at 487 n. 7. In that section, the Court merely points out that some claims based on a violation of the plaintiff's Fourth Amendment right to be free from unreasonable searches may not be subject to the *Heck* rule "[b]ecause of doctrines like independent source and inevitable discovery and especially harmless error." *Id*. (citations omitted). The language of the footnote does not support the broad proposition that the Defendants have advanced.

instituted against the plaintiff, i.e., when he is arraigned or bound over by a magistrate. *Id.* at 389-90. Based on this determination, the Court found that *Heck* did not dictate the start of the limitations period for the false arrest claim at issue. *Id*. at 393. The Court noted that *Heck* only applies to situations where the plaintiff has a conviction extant at the time the limitations period on his action begins to run. *Id*. at 392-93. Because the start of the limitations clock for a false arrest claim always precedes the plaintiff's conviction, the Court found that *Heck* principles do not apply to such claims. *Id*. at 393.

Defendants' attempt to apply *Wallace* to Wilson's Fifth Amendment claim misconstrues the scope of the Court's holding in that decision. The Supreme Court only had occasion to consider the applicability of *Heck* to the plaintiff's false arrest claim under section 1983. *Id*. at 387 n. 1 ("[w]e expressly limited our grant of certiorari to the *Fourth Amendment* false-arrest claim"). Additionally, the language of the Court's ultimate holding in *Wallace* demonstrates the narrowness of its application. *See id.* at 397 ("the statute of limitations upon a § 1983 claim seeking damages for a false arrest in violation of the *Fourth Amendment* . . ."). The Court's own restrictions on its holding in *Wallace* caution us against extending its application to Wilson's Fifth Amendment claim.

Beyond the expressed limitations of the Court's holding in *Wallace*, the fundamental differences between the false arrest claim in that case and Wilson's

coerced confession claim lend further support to our conclusion that *Wallace* does not apply. In Count II, Wilson alleges that: (1) Defendants violated his Fifth Amendment right to be free from compelled self-incrimination by coercing him to make a confession that was later introduced against him at trial; (2) the use of that statement led to his conviction for a crime that he did not commit; and (3) Defendants' actions proximately caused him damages resulting from his lengthy imprisonment. Wilson's action targets the wrongful institution of legal process against him and requests damages for the full duration of his imprisonment. In short, Wilson's action's closest common-law analogue is not false arrest but malicious prosecution. *See Heck v. Humphrey*, 512 U.S. 477, 484 (1994); Restatement (Second) of Torts § 653, 671 cmt. a (setting out elements of malicious prosecution and providing for recovery of damages for entirety of imprisonment). The statute of limitations for a malicious prosecution claim does not begin "until a conviction occurs and that conviction has been overturned." *Parish v. City*

*of Elkhart*, 614 F.3d 677, 682 (7th Cir. 2010).[5] Thus, *Heck* controls the start of the limitations period for Wilson's claim and *Wallace* does not apply.

Defendants have not presented us with any reason to deviate from our original conclusion that, under *Heck*, Wilson's claim did not accrue until his conviction was set aside in November 2006. Wilson filed his claim within two years of that date. Accordingly, Defendants' motion for summary judgment as to Count II is denied.

## II.    Motions For Summary Judgment Submitted By Moser, Graf, Richards, And Bonke

Though Moser, Graf, Richards, and Bonke have each filed separate motions, similarities in our analysis of the motions filed by Moser and Graf permit us to consider

---

[5] Defendants contend that the statute of limitations period for Wilson's claim began the moment his statement was introduced at trial based on the Seventh Circuit's holding in *Sornberger v. City of Knoxville*, 434 F.3d 1006 (7th Cir. 2006). In that case, the Seventh Circuit held that the plaintiff suffered an injury to her Fifth Amendment protection against compulsory self-incrimination when her coerced confession was introduced at a probable cause hearing. *Id*. at 1026-27. The court did not reach the question of when the plaintiff's section 1983 claim for violation of that right accrued. Even if they had, we do not think their holding would set the beginning of the limitations period for Wilson's claim. Unlike Wilson, the plaintiff in *Sornberger* had the charges against her dropped. *Id*. at 1026. Crucially, the plaintiff in *Sornberger* was not convicted or imprisoned based on her statement and only requested damages for her detention following the probable cause hearing but before her charges were dropped. *Id*. at 1026. The differences in the contours of Wilson's claim and the claim at issue in *Sornberger* convince us that the court's opinion in that case has little relevance to determining when Wilson's claim accrued.

their motions together before turning to discuss Richards' and Bonke's motions separately.

**A.  Motions For Summary Judgment Filed By Moser And Graf - Counts I-VII**

Moser and Graf argue they are entitled to summary judgment on Wilson's claims because the undisputed facts demonstrate they may not be held liable for other Defendants' violations of Wilson's constitutional and state-law rights on either a conspiracy or failure to intervene theory.

Moser and Graf maintain that they are entitled to summary judgment on Wilson's conspiracy claims because he has not marshaled enough circumstantial evidence of their involvement in a conspiracy to deprive Wilson of his rights.[6]  To be liable as a conspirator, an individual must, at a minimum, "understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do [his] part to further them." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). Wilson has submitted evidence that Moser and Graf assisted in his investigation and provided updates on their progress to the other Defendants who questioned Wilson at Area 1. Wilson has also presented evidence that Moser obtained Wilson's consent for a search

---

[6] The parties agree that the standards of proof for both federal conspiracy and civil conspiracy under Illinois law are essentially the same such that the principles employed in assessing one class of claims may be used in examining the merits of both types of actions.

of his residence, fielded a request for blood pressure medication from Wilson at the time of consent, and that Moser and Graf never delivered Wilson's medication to him after searching his home.

We do not think Wilson has enough for a reasonable juror to infer Moser and Graf's involvement in a conspiracy. Wilson's only evidence that Moser and Graf entered into an agreement consists of the regular contact between the two detectives and other Defendants with greater responsibility for Wilson's interrogation. The updates Moser and Graf provided only show that the two men remained in contact over the course of the investigation; to assert that such communications alone are sufficient evidence of conspiracy amounts to speculation. *See Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003). Nor does the record on summary judgment include anything to suggest Moser and Graf knowingly acted in furtherance of a conspiracy by depriving Wilson of his medication. Wilson did not exhibit any symptoms at the time he made his request to Moser and did not describe the potential health consequences that would ensue were he not to receive his medication. Without some basis to believe that Moser and Graf could have known that Wilson's will would suffer without his medicine, a reasonable juror could only conclude that the two men were mere inadvertent participants in a scheme to violate his constitutional rights. *See Jones v. Chicago*, 856 F.2d 986 ("[t]here is no such thing as accidental, inadvertent, or negligent participation

in a conspiracy"). Accordingly, we award summary judgment to Moser and Graf on Counts III, V, VI, and VII.

Moser and Graf also maintain they are entitled to summary judgment on Wilson's claim that the two detectives may be held liable for others' efforts to coerce his confession on a failure to intervene theory. "[U]nder certain circumstances a state actor's failure to intervene renders him or her culpable under § 1983." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). "[A]n officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know. . . that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005). Wilson has not presented any evidence that either Moser or Graf were present when other Defendants employed physical force in an effort to break Wilson's will such that their duty to intervene would attach. Graf never entered the interview room where Wilson allegedly suffered physical abuse at the hands of the other Defendants. Though some evidence indicates Moser entered the interview room to obtain Wilson's consent, we find nothing in the record to suggest that Moser witnessed others assault Wilson. Nor has Wilson put forth any evidence that Moser or Graf observed anything about Wilson's appearance

that would indicate that he suffered from a serious physical condition that the other Defendants refused to address. In the absence of any evidence that Moser or Graf observed a violation of Wilson's rights such that the duty to intervene would attach, we award summary judgment to Moser and Graf on Count IV. Wilson has not propounded any other theories to hold Moser and Graf liable for his section 1983 claims. Accordingly, we grant summary judgment for Moser and Graf as to Counts I and II.

**B.    Richards' Motion For Summary Judgment - Counts I-VII**

Richards also contends that summary judgment is appropriate on Wilson's section 1983 and state-law tort claims against him because Wilson does not have sufficient evidence to hold Richards liable on a conspiracy or failure to intervene theory.

In requesting summary judgment on the conspiracy claim, Richards highlights certain deficiencies in the record on summary judgment pertaining to his involvement in the alleged conspiracy to deprive Wilson of his rights. Wilson has presented evidence that Richards had a conversation with him during the in-person lineup for the Frost investigation in which Richards demonstrated the operation of a utility knife. Wilson contends that a reasonable juror could infer from this conversation that Richards provided hints to Wilson about the circumstances of the Siler and Frost attacks as part of a conspiracy to violate his rights. Wilson never testified that the officer who

demonstrated the knife ever alluded to the fact that a similar weapon was used in the Siler or Frost attacks. Despite the ambiguous nature of Richards' alleged statements, Wilson contends that the only justification for Richards' display of the utility knife would be to subliminally feed details about the crime as part of a previous agreement with Wilson's principal interrogators. This conclusion lacks sufficient basis in the content of Richards' discussion with Wilson and amounts to mere speculation as to Richards' motives; more than speculation is needed to survive summary judgment. *Gunville v. Walker*, 583 F.3d 979, 986 (7th Cir. 2009). Accordingly, we award summary judgment to Richards on Counts I, III, V, VI and VII.

Richards further argues that the undisputed facts would not permit a reasonable juror to find him liable for the violation of Wilson's rights to be free from compulsory self-incrimination on a failure to intervene basis. Wilson has presented testimony from which a juror could infer that Richards was in the room when O'Brien began to physically assault Wilson in an effort to secure a confession. Given Richards' presence in the same room where the physical coercion occurred, a reasonable juror could also conclude that he had a realistic opportunity to intervene to prevent Wilson's constitutional rights from being violated. Summary judgment is inappropriate when the circumstances permit a reasonable juror to reach such a conclusion. *See Lanigan v. Village of E. Hazel Crest*, 110 F.3d 467, 478 (7th Cir. 1997) ("[w]hether an officer had

sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise"). Accordingly, we deny Richards motion for summary judgment as to Counts II and IV.

## C.    Bonke's Motion For Summary Judgment

Bonke argues that he is entitled to summary judgment on Wilson's claims because the undisputed facts do not provide a basis to find him liable for other Defendants' violations of Wilson's constitutional or state-law rights on a theory of supervisory liability, conspiracy, or failure to intervene.

Bonke maintains that no reasonable juror could find him liable for Wilson's section 1983 claims based on his supervisory role. To be liable for the constitutional torts of your subordinates under § 1983, a supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001). Wilson contends that a juror could infer Bonke's knowledge of his subordinates' improper interrogation tactics and their concealment of the circumstances of Siler's identification. In support of their argument, they cite Bonke's role as supervisor of the Siler investigation, his review of various progress reports submitted by the other Defendants, and the fact that he received oral reports regarding developments in the Siler matter. Wilson has not submitted any

evidence to indicate that Bonke actually learned that his officers had employed physical force in obtaining a statement from Wilson. Nor has Wilson presented anything to indicate Bonke was aware of the precise content of the photo array displayed to Siler or the discussion which culminated in her identification of Wilson. We cannot hold Bonke liable for his subordinates' physical abuse of Wilson absent some suggestion that he knew it was going on. Similarly, we will not hold Bonke liable for others' efforts to suppress exculpatory evidence without any suggestion that he knew that the evidence existed or that his officers worked to suppress it. To accept Wilson's argument would lead to an inappropriate imposition of liability based only upon Bonke's position of authority over the other Defendants. *See Cygnar v. City of Chicago*, 865 F.2d 827, 847 (7th Cir. 1989) ("there is no doctrine of superior's liability in § 1983 actions").

Bonke also argues that Wilson has not presented sufficient evidence to subject Bonke to section 1983 or state-law liability on a conspiracy theory. Wilson's evidence of Bonke's entry into an agreement consists of his receipt of updates and communications with the other Defendants and his approval of reports that did not mention the other Defendants' abuse, the problematic aspects of Siler's identification, or Wagner's statement. A reasonable juror cannot infer Bonke's involvement in the conspiracy at issue merely from his approval of reports that omitted mention of these things. Some evidence that Bonke was aware of this information would be required

before a juror could infer Bonke failed to refer to the information in furtherance of a conspiracy. The remaining undisputed facts regarding Bonke's communications with his subordinates over the course of the investigation is not enough, standing on its own, for Wilson's conspiracy claim to survive summary judgment. *Goetzke v. Ferro Corp.*, 280 F.3d 766, 778 (7th Cir. 2002).

Nor has Wilson provided us with enough for his failure to intervene claim against Bonke to proceed to trial. Specifically, the record on summary judgment includes nothing to indicate Bonke witnessed other Defendants' use of physical force to obtain a statement from Wilson. We do not think that Wilson has presented sufficient evidence for a reasonable juror to find in his favor on that theory.

For these reasons, we grant Bonke's motion for summary judgment as to Counts I-VII.

## CONCLUSION

Defendants' motion for summary judgment on Count II is denied. Moser's motion for summary judgment is granted. Graf's motion for summary judgment is granted. Richards' motion for summary judgment is granted as to Counts I, III, V, VI and VII and denied as to Counts II and IV. Bonke's motion for summary judgment is granted.

_____

Charles P. Kocoras
United States District Judge

Dated: __February 25, 2011__