Westlaw

630 N.E.2d 1120 FOR EDUCATIONAL USE ONLY Page 1
259 Ill.App.3d 5, 630 N.E.2d 1120, 196 Ill.Dec. 955
**(Cite as: 259 Ill.App.3d 5, 630 N.E.2d 1120, 196 Ill.Dec. 955)**

C

Appellate Court of Illinois,
First District, Second Division.

The PEOPLE of the State of Illinois, Plaintiff-Appellant,
v.
Jesse CLEMON, Defendant-Appellee.

No. 1-92-4339.
Feb. 22, 1994.

Defendant charged with first-degree murder brought motion to suppress his statement to police. The Circuit Court, Cook County, Earl E. Strayhorn, J., granted motion, and the state filed interlocutory appeal. The Appellate Court, Hartman, J., held that circuit court did not abuse its discretion in suppressing defendant's statement as product of coercive environment.

Affirmed.

West Headnotes

**[1] Criminal Law 110 522(1)**

110 Criminal Law
110XVII Evidence
110XVII(T) Confessions
110k522 Threats and Fear
110k522(1) k. In General. Most Cited Cases

Circuit court did not abuse its discretion in suppressing defendant's confession as product of coercive environment, though defendant was advised of his constitutional rights and waived them, where defendant and other suspects were held in same area, they could be heard screaming, were subject to periodic interrogation, and defendant himself was heard screaming periodically for about 15 minutes when three to four police officers were in his room with door closed.

**[2] Criminal Law 110 519(1)**

110 Criminal Law
110XVII Evidence
110XVII(T) Confessions
110k519 Voluntary Character in General
110k519(1) k. What Confessions Are Voluntary. Most Cited Cases

Test for voluntariness is whether statement was made freely, voluntarily, and without compulsion or inducement of any sort, or whether defendant's will was overcome at time he or she confessed. U.S.C.A. Const.Amend. 5.

**[3] Criminal Law 110 519(1)**

110 Criminal Law
110XVII Evidence
110XVII(T) Confessions
110k519 Voluntary Character in General
110k519(1) k. What Confessions Are Voluntary. Most Cited Cases

Determination of voluntariness requires consideration of totality of circumstances, considering factors such as existence of any threats, promises or physical coercion; age, education, and intelligence of accused; length of detention and duration of questioning; and whether accused was advised of his or her constitutional rights. U.S.C.A. Const.Amend. 5.

**[4] Criminal Law 110 519(1)**

110 Criminal Law
110XVII Evidence
110XVII(T) Confessions
110k519 Voluntary Character in General
110k519(1) k. What Confessions Are Voluntary. Most Cited Cases

Wrongful or coercive police conduct is necessary precursor to finding that confession is involuntary.

**[5] Criminal Law 110 1158.13**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**EXHIBIT G**

630 N.E.2d 1120 FOR EDUCATIONAL USE ONLY Page 2
259 Ill.App.3d 5, 630 N.E.2d 1120, 196 Ill.Dec. 955
**(Cite as: 259 Ill.App.3d 5, 630 N.E.2d 1120, 196 Ill.Dec. 955)**

110 Criminal Law
110XXIV Review
110XXIV(O) Questions of Fact and Findings
110k1158.8 Evidence
110k1158.13 k. Admission, Statements, and Confessions. Most Cited Cases
(Formerly 110k1158(4))

Circuit court's finding of involuntariness of confession will not be disturbed on review unless it is against manifest weight of evidence, since circuit court is in best position to assess witness credibility, demeanor, and all other factors relevant to its determination.

**[6] Criminal Law 110 519(1)**

110 Criminal Law
110XVII Evidence
110XVII(T) Confessions
110k519 Voluntary Character in General
110k519(1) k. What Confessions Are Voluntary. Most Cited Cases

Mere presence of other suspect in same vicinity of police station as defendant cannot, in itself, constitute coercive atmosphere.

****1121 *5 ***956** Jack O'Malley, State's Atty., Cook County, Chicago (Renee Goldfarb, Donald Lyman and Hareena Meghani-Wakely, of counsel), for plaintiff-appellant.

Fred A. Wellisch, Chicago, for defendant-appellee.

***6** Justice HARTMAN delivered the opinion of the court:

The State filed this interlocutory appeal pursuant to Supreme Court Rule 604(a)(1) (145 Ill.2d R. 604(a)(1)), along with a certificate of substantial impairment. The State asserts that the circuit court's order granting defendant's motion to suppress his statement was contrary to the manifest weight of the evidence since defendant's statement was not the product of a coercive atmosphere.

Defendant, Jesse Clemon, was charged with two counts of first degree murder (Ill.Rev.Stat.1991, ch. 38, pars. 9-1(a)(1), (a)(2) (now 720 ILCS 5/9-1(a)(1), (a)(2) (West 1992))) and one count of unlawful use of a firearm by a felon (Ill.Rev.Stat.1991, ch. 38, par. 24-1.1(a) (now 720 ILCS 5/24-1.1(a) (West 1992))) for the shooting death of Alfredo Hernandez. Several codefendants were also charged in the murder.

Defendant's pre-trial motion to suppress his statement, claiming that (1) police physically coerced him into making the statement and (2) a coercive atmosphere existed which rendered the statement involuntary, was granted on the latter ground.

At the hearing on defendant's motion, Detectives James O'Brien and Tony Maslanka, and Officer Edward Maras, of the Chicago Police Department, testified for the State as follows. O'Brien and Maras arrested defendant at 2 a.m. on September 26, 1991, in a first floor apartment at 1501 West 51st Street and transported him to the Area Three police station where O'Brien and Maslanka interrogated him at 2:15 a.m. for 15 to 20 minutes. At 6:15 a.m., O'Brien and Assistant State's Attorney Stevenson again interviewed defendant, who gave them an oral statement. A third interview was conducted at 12:20 p.m. A written statement was signed by defendant with his left hand because, he explained, his right hand was injured during a fight earlier in the week. O'Brien and Stevenson were present when defendant signed his statement. O'Brien, Maras, and Maslanka all denied that defendant was abused while in custody.

Cassandra Clemon, defendant's mother, testified that she was seated in a squad car outside 1501 West 51st Street when defendant was arrested. She accompanied police to that location after they arrested her other two sons at her home. As defendant was being led from the apartment, four or five officers were hitting him with their fists, and one officer was hitting him with a flashlight. Defendant was screaming. The beating lasted five to ten minutes before defendant was placed in a separate squad car. At the police station, Ms. Clemon saw two officers take defendant upstairs. Defendant's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

630 N.E.2d 1120 FOR EDUCATIONAL USE ONLY Page 3
259 Ill.App.3d 5, 630 N.E.2d 1120, 196 Ill.Dec. 955
**(Cite as: 259 Ill.App.3d 5, 630 N.E.2d 1120, 196 Ill.Dec. 955)**

hand was injured, but she did not know whether the injury occurred before or after his arrest. As Ms. Clemon was waiting on the first floor, she heard defendant***7** and her other sons "hollering" upstairs. She did not tell anyone about defendant's beating because she did not have time.

****1122 ***957** Iamari Clemon, defendant's brother, testified that he was also arrested on September 26, 1991. He was placed in a holding cell diagonally across from an interview room where police later placed defendant. Iamari saw shadows through the window of defendant's room, from which he could see police hitting defendant and defendant fall to the floor. He also heard defendant "hollering" and saying, "I didn't do it." Officers later placed Iamari in an interview room where they hit him with their fists for 30 to 40 minutes.

Following Iamari's testimony, defense counsel informed the court that a key defense witness, Myron James, had failed to appear. The court denied defendant's motion to suppress without prejudice and gave defense counsel permission to reopen the motion when Myron appeared.

Myron appeared later and testified that at 11 p.m. on September 25, 1991, he was arrested with Diyez Owens and Steve Taylor and was placed in a squad car, where defendant was also later placed. They were taken to the third floor of Area Three. Iamari, Damoni Clemon, Marcus Wiggins, and Clinton Welton were already there. Using a diagram, Myron showed where the police placed the suspects on the third floor. Initially, Myron was seated on a bench. Defendant was put in an interview room right behind that bench. Steve was handcuffed in a bathroom. Iamari and two unidentified people were in the holding cell. Clinton, Diyez, and Damoni were placed in separate rooms. About 10 to 15 officers were present on the floor as well.

Myron himself was never threatened, hit or electrically shocked by any police officer. During the 12 or 13 hours he was in custody, however, he witnessed the following events. Myron heard Marcus, whom he had known all his life, screaming from a room in the back. Myron saw police at various times take other suspects into defendant's room for a few minutes each. He then heard defendant screaming periodically for about 15 minutes when three or four officers were in his room with the door closed. When defendant emerged from the room, he was limping, holding his stomach, and said "I'm sick." His hand was bandaged. The police placed Myron and defendant in a line-up. Afterwards, Myron was put in the holding cell, and defendant returned to his room with several officers. When the door to defendant's room cracked open, Myron saw an officer writing something.

The holding cell was right next to the room in which Damoni had been placed. Myron saw some officers go into Damoni's room with a black object smaller than a flashlight. They remained there for 15 ***8** minutes, during which time Myron heard Damoni screaming. When they came out, Damoni told Myron he had been electrically shocked. Myron saw police beat Clinton for 15 to 20 minutes through the open door to Clinton's room, the only physical beating he witnessed. Clinton was "hollering," and Myron could hear the officers' voices. Myron did not hear anything from Diyez, or from Iamari when Iamari was in the holding cell. Myron was released and never was charged with any crime.

On cross-examination, Myron stated that he could not recall exactly what the officers looked like, except that two had mustaches and some were small and some were big. After he left the station, the first person he told about the screaming was Marcus' mother. He told a public defender about the screaming when he was interviewed in 1992. Myron was aware that Marcus was claiming he had been electrically shocked while in custody.

Officer Kenneth Boudreau testified in rebuttal that a person would not be able to hear a conversation taking place in Damoni's or Clinton's room; however, screaming might be heard if it occurred.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

630 N.E.2d 1120 FOR EDUCATIONAL USE ONLY Page 4
259 Ill.App.3d 5, 630 N.E.2d 1120, 196 Ill.Dec. 955
**(Cite as: 259 Ill.App.3d 5, 630 N.E.2d 1120, 196 Ill.Dec. 955)**

Boudreau heard no screaming on the third floor on September 26. Eleven arrestees were present on that floor. When several suspects are brought into Area Three, they are not put together and are not allowed to speak with each other.

The circuit court granted defendant's motion to suppress his statement. In doing so, the following colloquy occurred between an assistant state's attorney and the court:

"[THE STATE:] * * * [The court] already denied the motion based on the testimony**1123 ***958 other than Myron James, which counsel reopened-

THE COURT: But I am considering changing. I find [Myron] James very credible.

Given the atmosphere that existed in that District with eleven people under suspicion in custody in the same location the atmosphere must have been horrendously oppressive and I am going to suppress the statements, but you can argue.

[THE STATE]:

* * * * * *

[The mother] tells you the beating started inside a house.

THE COURT: I am not talking about the beating. I am concerned about the fact that eleven suspects in the same room being questioned periodically from time to time; that is oppressive. I am going to suppress it on the basis that I think there is a likelihood there was some screaming going on and I am going to suppress this statement.

* * * * * *

***9** [THE STATE]: First of all, Myron James, who [the court] is calling a credible witness, he is on probation for a drug charge.

THE COURT: That does not make him incredible because he is on probation.

* * * * * *

You had a chance to cross-examine him and you didn't touch him.

[THE STATE]:

* * * * * *

* * * [Myron James] is coming forward to say that he sees someone getting hit, although when I asked him he said he didn't-

THE COURT: No. I am not basing my suppression on his credibility as to someone being struck. I am basing my ruling solely on the oppressive atmosphere that existed in that, in that headquarters on that evening with eleven people in custody being questioned about this crime.

[THE STATE]: If I may just address that point then as long as you are saying you are not finding it on a beating and not finding it on any of the electric thing [*sic* ] they brought up.

As far as the oppressive nature, Judge, Area Three Violent Crimes; this is it.

THE COURT: But they don't have to bring eleven people up there. They have a holding cell downstairs. That they could have left everybody downstairs and brought them up individually.

* * * * * *

[THE STATE]: They were all in separate rooms. There is nothing else the police could have done in this case.

THE COURT: Sure there is. Motion to suppress [defendant's statement] sustained."

[1] The State contends that the circuit court's ruling is manifestly erroneous because it improperly determined that a coercive environment existed, and because it failed to apply the proper,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

630 N.E.2d 1120 FOR EDUCATIONAL USE ONLY Page 5
259 Ill.App.3d 5, 630 N.E.2d 1120, 196 Ill.Dec. 955
**(Cite as: 259 Ill.App.3d 5, 630 N.E.2d 1120, 196 Ill.Dec. 955)**

"totality of the circumstances" standard when it determined involuntariness.

[2][3][4][5] The test of voluntariness is whether the statement was made freely, voluntarily, and without compulsion or inducement of any sort, or whether a defendant's will was overcome at the time he or she confessed. ( *People v. Melock* (1992), 149 Ill.2d 423, 447, 174 Ill.Dec. 857, 599 N.E.2d 941.) A determination of voluntariness requires consideration of the totality of the circumstances ( *Melock,* 149 Ill.2d at 447, 174 Ill.Dec. 857, 599 N.E.2d 941), considering factors such as the existence of any threats, promises or physical coercion; the age, education, and intelligence of the accused; the length of the detention and the duration of the questioning; and whether the accused was advised of his or her constitutional rights. ( *People v. House* (1990), 141 Ill.2d 323, 376, 152 Ill.Dec. 572, 566 N.E.2d 259.) No single fact is dispositive; the determination of voluntariness must be made on the ***10** facts of each case. ( *Melock,* 149 Ill.2d at 447-48, 174 Ill.Dec. 857, 599 N.E.2d 941.) Wrongful or coercive police conduct is a necessary precursor to finding that a confession is involuntary. ( ****1124***959***Colorado v. Connelly* (1986), 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473, 484.) A circuit court's finding of involuntariness will not be disturbed on review unless it is against the manifest weight of the evidence ( *House,* 141 Ill.2d at 376, 152 Ill.Dec. 572, 566 N.E.2d 259), since the circuit court is in the best position to assess witness credibility, demeanor, and all other factors relevant to its determination. *People v. Nolan* (1978), 59 Ill.App.3d 177, 186, 16 Ill.Dec. 572, 375 N.E.2d 445.

[6] The State contends that the circuit court found an oppressive atmosphere to exist simply because other suspects in the case were present at the police station, and failed to apply the "totality of the circumstances" standard for determining involuntariness. It correctly notes that the mere presence of other suspects in the same vicinity of a police station as a defendant cannot, in itself, constitute a coercive atmosphere. (See *People v. Goins* (1987), 161 Ill.App.3d 541, 113 Ill.Dec. 386, 515 N.E.2d 195.) Therefore, the State concludes, the circuit court committed manifest error by "creating an unreasonable definition of coercion." Such ruling, the State submits, is akin to holding "that coercive conditions *per se* exist in every police station."

Applying the totality of the circumstances test set forth *supra*, the State claims the following circumstances support a finding of manifest error. First, defendant was advised of his constitutional rights and waived them before making the statement. Second, defendant was an adult, not a juvenile. Third, there was no evidence defendant's intelligence was below average or that he failed to understand the ramifications of waiving *Miranda* rights and giving a statement. Fourth, defendant's detention lasted only 10 and one-half hours. Fifth, the interrogations were not continuous and intensive, but were intermittent. Sixth, there was no evidence defendant's will was overcome due to deprivation of food, water or sleep. Last, the court specifically stated it did not base its ruling on any findings of a physical beating.

The circuit court cited several factors, however, to support its finding that a "horrendously oppressive" atmosphere existed at Area Three at the time defendant's statement was taken. The court clearly found Myron's testimony detailing some of this evidence both credible and compelling. Myron testified that several suspects were held on the station floor and questioned; police testimony placed that figure at 11. Myron heard Marcus, defendant, Damoni, and Clinton screaming at different times during the night. He saw officers hit Clinton through an open door, but otherwise witnessed no beatings. As a result, the court found the atmosphere "horrendously oppressive" ***11** based upon the fact that defendant and other suspects were placed in an area where detainees could be heard screaming and were subjected to periodical interrogation. Myron also testified that defendant himself was screaming periodically for about 15 minutes when three or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 1:07-cv-03994 Document #: 263-7 Filed: 04/08/11 Page 6 of 6 PageID #:3689
630 N.E.2d 1120 FOR EDUCATIONAL USE ONLY Page 6
259 Ill.App.3d 5, 630 N.E.2d 1120, 196 Ill.Dec. 955
**(Cite as: 259 Ill.App.3d 5, 630 N.E.2d 1120, 196 Ill.Dec. 955)**

four officers were in his room with the door closed. The court had the right to infer from this evidence the existence of some type of threat, at the minimum, of physical coercion, which may take several forms other than physical beating. Although a 10 and one-half hour detention generally is not considered unreasonable in itself, when, as here, the detention is combined with periodic screaming throughout the night, it supports defendant's theory of a coercive environment. Under these circumstances, it cannot be said that the court's suppression of defendant's statement is against the manifest weight of the evidence.

From the foregoing we conclude that the suppression of defendant's statement must be affirmed.

Affirmed.

SCARIANO and McCORMICK, JJ., concur.

Ill.App. 1 Dist.,1994.
People v. Clemon
259 Ill.App.3d 5, 630 N.E.2d 1120, 196 Ill.Dec. 955

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.